678 A.2d 153

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
JOHN M. GARTHE, DEFENDANT–RESPONDENT.

Argued March 25, 1996—Decided June 27, 1996.

*Mark P. Stalford,* Assistant Prosecutor, argued the cause for appellant (*John A. Kaye,* Monmouth County Prosecutor, attorney; *Paul J. Feldman,* Senior Staff Attorney, of counsel).

*John Menzel,* argued the cause for respondent.

*Boris Moczula,* Special Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

The opinion of the Court was delivered by

O'HERN, J.

The principal question in this appeal is whether the standards and procedures for testing the breathalyzers used in the prosecution of drunk driving cases must be set forth in regulations adopted pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B-1 to -24. The related questions are whether the testing protocols promulgated by the Division of State Police after the decision below were those followed in this case, and whether those protocols are sufficiently reliable and objective so that the working condition of a breathalyzer may be established without the testimony of the State Police Inspector who examined it.

I

At approximately 10:20 p.m. on January 25, 1992, a Spring Lake Police Officer on routine patrol stopped defendant John Garthe on Ocean Avenue for speeding. After observing defendant "fumble through his wallet," the officer detected "a strong odor of alcohol" on defendant's breath. Suspecting that defendant was under the influence of alcohol, the officer asked the defendant to step out of the car. Defendant experienced some difficulty climbing out of the car. When the officer inquired about the contents of two red plastic cups on the car's console, defendant replied that they contained vodka and soda. By that time another officer had arrived on the scene. When defendant exhibited poor balance

during roadside tests, that officer placed Garthe under arrest for driving while intoxicated (DWI), in violation of *N.J.S.A.* 39:4–50.

At police headquarters, defendant consented to a breathalyzer test. The arresting officer, a certified breathalyzer operator, performed tests at 11:31 p.m. and 11:41 p.m. using a Smith & Wesson Model 900 breathalyzer.[1] Both tests indicated a .13 per cent blood alcohol content (BAC). Following the tests, defendant admitted to drinking six beers since 6:30 p.m. at the Belmar Fishing Club. Based on the breathalyzer readings and defendant's admission of drinking, the officer charged defendant with driving while intoxicated and other motor vehicle offenses.

To establish at the municipal court trial that the breathalyzer was in proper operating order, the State planned to offer a certified copy of a Breath Test Inspector's Inspection Certificate (BTIIC or Inspection Certificate). Before trial, defendant moved to exclude the breath test readings on the basis that the State failed to comply with the procedural and substantive due process requirements of the Administrative Procedure Act in establishing its breathalyzer testing procedures.

Defendant also argued that in the absence of promulgated inspection procedures, a court could not take judicial notice of any

---

[1] The breathalyzer is essentially a light balancing device. The machine contains a source of light positioned between two photoelectric cells that measure the intensity of the light. The light directed to each of the cells is filtered through two chemical cells (the ampoules). A needle on the machine indicates when the current from both cells is equal and opposite. To conduct a test of a suspected drunk driver, one of the ampoules is broken and the driver's breath sample is bubbled through the chemicals in the ampoule. Alcohol in the breath lightens the color of the ampoule. This in turn increases the light passing through the ampoule, causing the current from that ampoule's cell to increase and the needle measuring the energy output to move. To measure the alcohol in the breath, the operator moves the light until the needle again reads zero. The distance traveled by the source of light is calibrated to measure the alcohol in the breath. *Romano v. Kimmelman,* 96 *N.J.* 66, 79–80, 474 *A.2d* 1 (1984). The concentration of alcohol in the breath (BRAC) is correlated by a scientific formula to the alcohol concentration in the brain (BAC). *State v. Downie,* 117 *N.J.* 450, 451, 569 *A.2d* 242, *cert. denied,* 498 *U.S.* 819, 111 *S.Ct.* 63, 112 *L.Ed.2d* 38 (1990).

facts that would clarify the meaning of certain conclusionary language on the face of the inspection certificates, such as "OK" or "within acceptable tolerances." Thus, defendant argued that the opinions and conclusions of the State Police inspector on the face of the inspection certificates would be hearsay statements, not probative of the working condition of Garthe's breathalyzer instrument, and would fall under no exception to the hearsay rule.

Rejecting defendant's arguments that the certificates were inadmissible as business or official records, the municipal court found defendant guilty of a per se violation of DWI. *N.J.S.A.* 39:4–50(a) provides that "[a] person who operates a motor vehicle ... with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood" is guilty of DWI and subject to the punishments established for that offense. The court fined defendant $250.00, directed that he serve twelve to forty-eight hours in an Intoxicated Driver Resource Center over a two-day period, and, in addition to imposing other costs and fees, revoked his license for six months.

The Law Division reimposed defendant's conviction after a trial de novo. That court again rejected defendant's argument that the inspection certificates were inadmissible as hearsay because the certificates of inspection used to certify that the machines were in working order required discretionary conclusions rather than objective and quantifiable findings based on defined standards. The court stayed defendant's sentence pending appeal to the Appellate Division.

On appeal, the Appellate Division reversed in an unreported opinion. It held that although inspection certificates certifying the machine's calibration before and after the defendant's testing were admissible as business records, the absence of any identifiable standards used by the officer certifying the proper functioning of the breathalyzer instrument rendered the certificates useless to establish by clear and convincing proof that the machine was in proper working order at the time of defendant's breath test. In the absence of such standards, the court believed that it "was

being asked to accept on blind faith the subjective conclusions of the inspector." It reasoned that "[i]f there were published regulations setting forth what standards or deviations from such standards would constitute proper working order or acceptable tolerances, perhaps the abbreviated report of the results might be acceptable." It thus concluded:

> The present certificates, properly in evidence as an exception to the hearsay rule, only placed before the court the conclusion of the breathalyzer inspector that in the inspector's opinion the machine tested within "acceptable tolerances" and that the various working systems in the instrument functioned "O.K." The court, however, had no way of knowing what that meant.

We granted the State's petition for certification to review the reversal of defendant's conviction. 143 *N.J.* 321, 670 *A.*2d 1062 (1995).

## II

*Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984), sets forth the test to apply when determining whether an agency action constitutes rulemaking:

> [A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

> [*Id.* at 331–32, 478 *A.*2d 742.]

All of those factors need not be present for an agency determination to constitute rulemaking and are to be balanced according to weight, not number.

Obviously, not every action of a State agency, including informal action, is subject to the formal notice and comment requirements of *N.J.S.A.* 52:14B–4. In making this qualitative determination, we have generally considered: (1) the segment of the public to be affected by the administrative action; (2) the generality of application of the agency action; (3) the prospectiveness of the result; and (4) the novelty of any legal standard announced. *George Harms Constr. Co. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 18, 644 *A.*2d 76 (1994) (citation omitted).

We are satisfied that, giving proper weight to the factors, the action of the State Police in setting forth procedures to test breathalyzer machines is more like an intra-agency memorandum than rulemaking. Regulations generally are needed when the affected public must conform its conduct with the governmental directive. Although this agency action (promulgation of test procedures) ultimately affects the general public, the agency action does not, in any sense, shape the conduct of the public. The conduct of the public is fully circumscribed by the provisions of *N.J.S.A.* 39:4–50 to –51a, the drunk driving statutes.

Nor do we view those test procedures as setting forth "a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization." *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742. The legal standards and directives for testing breathalyzers stem from this Court's decision in *Romano v. Kimmelman, supra,* that the machine must be in "proper working order" at the time of the test. 96 *N.J.* at 82, 474 *A.*2d 1. We are informed that the test procedures were derived from the manufacturer's recommendations. A number of prior decisions had referred to the standards and procedures used to test breathalyzer machines. *E.g., State v. Maure,* 240 *N.J.Super.* 269, 573 *A.*2d 186 (App.Div.1990), *aff'd,* 123 *N.J.* 457, 588 *A.*2d 383 (1991); *State v. Slinger,* 281 *N.J.Super.* 538, 658 *A.*2d 1299 (App.Div.1995).

An almost identical issue of rulemaking was presented to the Washington Supreme Court in *State v. Straka,* 116 *Wash.*2d 859,

810 *P.2d* 888 (1991). Washington law requires that the state toxicologist approve methods to test the devices in use there for breath alcohol analysis. Although operating under a slightly different administrative framework, the Washington court held that its state toxicologist was not required to promulgate through formal administrative rulemaking the methods to be used for evaluating and certifying the operability of its devices for measurement of a person's BRAC. The court reasoned that the toxicologist's establishment of test procedures did not constitute "rules" that "establishe[d], alter[ed], or revoke[d]" a citizen's enjoyment of driving "benefits or privileges conferred by law." *Id.* at 892, 810 *P.*2d 888. We agree with that reasoning.

### III

█ Compliance with the Administrative Procedure Act, however, does not exhaust the sum of constitutional due process. A municipal court proceeding is a quasi-criminal proceeding in which a defendant is entitled to due process of law. The essence of due process certainly requires that the parties have adequate notice and opportunity to know the State's evidence and to present evidence in argument and response.

In *Romano, supra,* we held that the results of a Smith & Wesson breathalyzer test generally would be admissible in evidence in DWI prosecutions

> when the breathalyzer instrument is in proper working order, is administered by a qualified operator and is used in accordance with accepted procedures, and that such results may, upon the establishment of these conditions, form the basis upon which a conviction of violating *N.J.S.A.* 39:4–50 may be obtained.
>
> [96 *N.J.* at 82, 474 *A.*2d 1.] [2]

We further held that "the responsibility for establishing all conditions as to the admissibility of the breathalyzer results is properly allocated to the State." *Id.* at 91, 474 *A.*2d 1. Those conditions

---

[2] Because the Model 900A Smith & Wesson breathalyzer was potentially subject to radio frequency interference, the Court imposed additional safeguards for the use of that model.

must clearly be established by the standard conventionally referred to as "clear and convincing proof." *Id.* at 90, 474 *A*.2d 1.

In this case, we deal only with the first of the three preconditions to the admissibility of breathalyzer evidence, namely, that the instrument itself be in proper working order at the time of the test. We agree that the procedures or protocols established by the State must be designed to ensure that the machine will produce reliable results.

To meet its burden to establish by clear and convincing proof the conditions for admissibility of the breathalyzer results, the State offered a breathalyzer inspection certificate in the form set forth in Appendix "A" of this opinion. Actually there were two such certificates—one covering an inspection before Garthe was tested and one after. As noted, defendant objected to the admissibility of those certificates as business or official record exceptions to the hearsay rule. See *N.J.R.E.* 803(c)(6) and 803(c)(8) for the current versions of those rules. In *State v. Matulewicz*, 101 *N.J.* 27, 499 *A*.2d 1363 (1985), we discussed the scope of the official or business records exceptions in the context of criminal forensic proofs. *Matulewicz* involved the admissibility of a State Police laboratory report to establish that substances were drugs. We held that more data on the manner of the report's preparation was required to validate the admissibility of the report without producing the laboratory technician.[3] We noted that the official or business records exception is founded upon the theory

"that records which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness, and therefore ought to be received in evidence." *Mahoney v. Minsky,* 39 *N.J.* 208, 218, 188 *A*.2d 161 (1963). However, this general acceptance of reliability will not attach if "the trial court, after examining them ... and hearing the manner of their preparation explained, entertains serious doubt as to whether they are dependable or worthy of confidence." *Ibid.*

[*Matulewicz, supra,* 101 *N.J.* at 29–30, 499 *A*.2d 1363.]

---

[3] *N.J.S.A.* 2C:35–19 now requires a defendant to object to a proffer of a State Police laboratory report of drug testing within ten days of receiving notice that the State intends to rely on the certificate.

Among the factors to consider in determining reliability are

> the relative degrees of objectivity and subjectivity involved in the procedure; the regularity with which these analyses are done; the routine quality of each analysis; the presence of any motive to single out a specific analysis for the purpose of rendering an untrustworthy report, and the responsibility of [the technician] to make accurate and reliable analyses.
>
> [*Id.* at 30, 499 *A.*2d 1363.]

We noted that " 'there is a presumption, absent contrary testimony, that those responsible for services to the public will carry out their duties in a proper, careful and prudent manner.' " *Id.* at 31, 499 *A.*2d 1363 (quoting *State v. Hudes,* 128 *N.J.Super.* 589, 602, 321 *A.*2d 275 (Co.Ct., Law Div.1974) and citing *State v. McGeary,* 129 *N.J.Super.* 219, 322 *A.*2d 830 (App.Div.1974) (holding that there is no basis for conceiving that State Police Inspector would violate duty and certify that breathalyzer was functioning properly when truth was to the contrary)) (other citation omitted).

Following the 1974 *McGeary* decision, municipal courts received in evidence the inspection certificates prepared by the State Police Inspector assigned to the machine. In his *Guide to Hearing Drunk Driving Cases,* Nathan S. Kirsch wrote:

> In *State v. McGeary* ... the court ruled that the working condition of the [breathalyzer] machine could be proved without the testimony of the State Trooper who examined it. A certificate of inspection could be introduced under our Rules of Evidence 63(13) as a business record of the police department, or it could be admitted under our Rules of Evidence 63(15) as a report or finding of a public official subject to the authentication of the trooper's signature (under Rule 67) and subject to timely notice being given to the defendant of the State's intended use of the inspection certificate (Rule 64).[4]
>
> [Nathan S. Kirsch, J.M.C. (Ret.), New Jersey Department of Health, *Guide To Hearing Drunk Driving Cases* 29 (Revised September 1993) (citation omitted).]

As noted, at the municipal court level the objection to the admissibility of those certificates was that the report was based on "discretionary conclusions rather than objective, quantifiable, observable standards." The Appellate Division reversed, not be-

---

[4] The *Evidence Rules* cited correspond now, respectively, to *N.J.R.E.* 803(c)(6), 803(c)(8), 901 and 807.

cause the conclusions of the testing officer were discretionary, but, rather, because it had no way of knowing whether they were discretionary or routine.

If defendant had reason to put in issue the nature and specifics of the test protocols employed, he would have been entitled to discovery. *See* Richard Zylman et al., *Defending the Drinking Driving Charge in New Jersey* 94–96 (1985).[5] We were informed at oral argument that the Superintendent of the State Police had once published the test protocols but withdrew the specifications because they had not been properly approved. Following the Appellate Division's decision in this case, they were republished and are set forth in Appendix "B" of this opinion. There is no genuine dispute in this case that those were the standards and protocols that were followed.

■ Defendant has raised a number of concerns about the reliability of the State Police test procedures. For example, there is no requirement that the officer conducting the test record certain actual readings of the machine under test circumstances. One test requires that the breathalyzer's internal temperature should be 50 degrees Celsius (122 degrees Fahrenheit), plus or minus 3 degrees Celsius. Instead of recording the machine's temperature, the officer reports "OK." Defendant contends that the police should be required to record the machine's actual temperature. Similarly, if the machine reads the simulated breath alcohol percentage within the acceptable parameters, the test operator is instructed to note that "6 tests [were] within acceptable tolerance," that is, within 0.010 of each other and within the range of 0.090 and 0.105. Defendant has suggested that the actual readings would be relevant to challenge the reliability of the

---

[5] The authors of that treatise suggest to those defending DWI cases in New Jersey that they rely on *Evidence Rule* 64 (now 807) to exclude the test certificates. That Rule gives discretion to courts to exclude evidence if the State has not given fair notice of intent to rely on the official records exception. Suggested discovery materials did not include the breathalyzer test procedures. *Defending the Drinking Driving Charge, supra,* at 98.

machine because the combination of tolerances might demonstrate a flaw in the machine. However, there is nothing in the record that questions the "circumstantial probability of [the BTIIC's] trustworthiness." *Matulewicz, supra,* 101 *N.J.* at 29–30, 499 *A.*2d 1363. We consider it fair to take judicial notice of the case law that has described the substance of those test procedures that lend objective reliability to the BTIICs. We also note that New York's procedures for testing breathalyzer machines and method of recording the results of such tests on certificates of calibration are substantially similar to New Jersey's. *See* Peter Gerstenzang, *Handling The DWI Case In New York* 427 (Appendix 42) (West 1988).

## IV

What undoubtedly concerned the Appellate Division is that in an earlier decision it had ordered the Division of State Police to adopt its breathalyzer testing procedures in accordance with the New Jersey Administrative Practice Act. The proper procedure to challenge that order would have been to appeal the order.

The Legislature has made an enormous commitment of the public's trust to the reliability of the Smith & Wesson breath testing device. A citizen's right to drive, and sometimes to liberty, will depend on the verdict of a machine. Like the Legislature, we acknowledge, however, that "[e]very method of ascertaining blood alcohol carries inherent problems. No method is 100% accurate." *State v. Downie, supra,* 117 *N.J.* at 468, 569 *A.*2d 242. "All mechanical and scientific devices have some degree of tolerance within which they are accurate. Breath test devices are no exception." E. John Wherry, Jr., *The Rush to Convict DWI Offenders: The Unintended Constitutional Consequences,* 19 *U. Dayton L.Rev.* 429, 448 (1994); *see also State v. Downie, supra,* 117 *N.J.* at 462, 569 *A.*2d 242 (acknowledging, however, that "in only 2.3% of cases does the breathalyzer materially overestimate the blood-alcohol level potentially to the detriment of the accused").

Because of the magnitude of the consequences of a DWI conviction, we have examined, and will continue to examine, any scientifically-sound challenge to the reliability of breathalyzer test results. *See generally Romano, supra,* 96 *N.J.* 66, 474 *A.2d* 1; *Downie, supra,* 117 *N.J.* 450, 569 *A.2d* 242 (entertaining challenges and ordering remands for fact finding to assess possible effect on test results of radio frequency interference of blood-breath ration deviations among DWI suspects).

Despite the scientific validation of the breathalyzer, some continue to question the fairness of the application of the DWI statute. *See generally* Russell J. Carbone and Stanley J. Broskey, *Why Courts Should Allow DWI Defenses,* 144 *N.J.L.J.* 243 (April 15, 1996) (observing that New Jersey is among the few states in which the breathalyzer machine does not itself record the BRAC, leaving it to the operator to read the gauge and that other states have adopted infrared devices or automatic printing breath detectors). We are certain that New Jersey will continue to update its technology in this field but there is no evidence that the machine itself is unreliable if properly operated.

▪ In this case, defendant did not directly challenge the reliability of the breathalyzer test procedures employed by the Division of State Police. His challenge was procedural, not substantive. Because defendant did not seek to discover before trial the test procedures employed, he was able to pose a hypothetical absence of objectivity in the test procedures. The actual test procedures employed meet the *Matulewicz* standards for admissibility in terms of "objectivity ... regularity ... routine quality," and absence of any "motive to single out a specific analysis for the purpose of rendering an untrustworthy report." 101 *N.J.* at 30, 499 *A.2d* 1363. There was no evidence to suggest that a combination of tolerances would cause a distortion in test results other than that presently acknowledged to exist. Absent any such evidence that the test protocols established by the Division and State are not scientifically reliable to establish that breathalyzer machines are in proper operating order, the State may, subject to

the requirements of *N.J.R.E.* 803(c)(6), 803(c)(8), 807 and 901, offer in admission at DWI trials inspection certificates in the form annexed hereto.

The judgment of the Appellate Division is reversed and the judgment of conviction is reinstated.

## APPENDIX A

A.1

STATE OF NEW JERSEY
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF STATE POLICE
BREATH TESTING INSTRUMENT INSPECTION CERTIFICATE

Periodic Inspection ☒ Number 104-92
Other Inspection ☐ Date 1/6/92

Instrument: BREATHALYZER 900   Serial Number: 5051   Department: SPRING LAKE BOROUGH   County: MONMOUTH

| Cylinder Output | Ampecle Control Number | Optical System | Balance Lett Motion | Instrument Temperature | Simulator Solution Percentage | Instrument Test Percentage Results |
|---|---|---|---|---|---|---|
| OK | 1.) 90/02  2.) 02091 | OK | OK | OK | LATH 9171 .10 | *SEE BELOW |

INSTRUMENT LOCATION: N/A
Scanning Check: N/A   Effect   No Effect   Remarks

☒ ABOVE INSTRUMENT IS NOT RFI SENSITIVE

RADIO TRANSMISSION TESTING

| OPERATING FREQUENCY | CHANNEL DESIGNATION | BASE STATION | MOBILE (Distance) | PORTABLE (Distance) | REMARKS |
|---|---|---|---|---|---|
| N/A | | | | | |

\* 6 TESTS WITHIN ACCEPTABLE TOLERANCES

REMARKS: AS PART OF ROUTINE PREVENTIVE MAINTENANCE I REPLACED THE RETRACTABLE IMPLE TUBE. INSTRUMENT IN PROPER OPERATING CONDITION BEFORE + AFTER MAINTENANCE PROCEDURE RECEIVED PROPER SIMULATOR TEST RESULTS BEFORE + AFTER MAINTENANCE PROCEDURE.

The above instrument has been ☐ repaired and ☒ inspected and found to be in satisfactory working condition.

"I am a Breath Test Coordinator Instructor, empowered by the Attorney General of the State of New Jersey, pursuant to the provisions of P. L. 1966 c. 142 S3 as amended (C. 39:4-50.3) and rules and regulations adopted thereunder, to perform inspection and maintenance of approved instruments for performing chemical analysis of a person's breath. I hereby affirm that I have inspected the approved instrument designated on this certificate. I further attest that this document contains a true, accurate and complete record of the inspection and maintenance performed herein, including random sample testing of ampoules used in the operation of this approved instrument as is evidenced by the ampoules control number (s) designated on this certificate. The original document of this inspection is on file at Division Headquarters of the New Jersey State Police, P.O. Box 7068, West Trenton, New Jersey 08628-0068."

Date: JANUARY 6, 1992

Signature: [signature]
Name and Badge Number (Print): TPR. G.L. SNOWDEN #3457

LEGEND:

## APPENDIX B

### *FORENSIC SCIENCE BUREAU, ALCOHOL/DRUG TEST UNIT STANDARD PROCEDURE FOR INSPECTING BREATH TEST INSTRUMENTS*

Pursuant to instruction issued by the Forensic Science Bureau Chief, the following is the standard procedure to be followed when inspecting breath test instruments and preparing State Police Form S.P. 343 (Rev.6–86) "Breath Testing Instrument Inspection Certificate."

### *TYPE OF INSPECTION*

#### *Periodic Inspection*

Inspection will be listed as "Periodic," if it is a routinely scheduled inspection.

#### *Other Inspection*

Inspection will be listed as "Other," if the inspection is not of a routine nature, such as listed below:

1. Complaint by a police department (founded/unfounded).
2. New instrument(s) placed into service.
3. Return of an instrument to service after factory repairs have been made. (Out-of-service inspection can be listed as either "Periodic" or "Other.")
4. Inspections made immediately prior to and subsequent to court ordered independent expert inspection or examination.
5. Change of location of a Model 900A Breathalyzer. (Must be immediately preceded by a periodic inspection at the former location of the instrument.)

### *IDENTIFICATION INFORMATION*

#### *Sequential Number*

Inspections will be numbered sequentially, commencing with Number One and ending when the instrument is removed from service. The sequential number will be followed with a hyphen and the last two digits of the year in which the inspection is conducted.

If a State Police instrument is reassigned from one barracks to another, the sequential numbering for that instrument will continue.

If a State Police instrument is reassigned to another police department or law enforcement agency, the sequential numbering for that instrument will begin again at Number One.

## Date

The date the instrument is inspected will be recorded numerically (month/day/year).

## Instrument

Identify the instrument being inspected by its name and model number.

## Serial Number

Enter the complete serial number of the instrument being inspected.

## Department

Fully identify, by name, the police department or law enforcement agency to which the instrument is assigned.

## County

Record the county in which the instrument is assigned.

## EXAMINATION OF INSTRUMENT—MECHANICAL & ANALYTIC INSPECTION

### Cylinder Output

Turn instrument on. With instrument at room temperature, connect output gauge to capillary tube. Turn control knob to the "Take" position, Introduce an air sample with atomizer and turn control knob to the "Analyze" position. Delivery time should be between 25 and 35 seconds. Gauge should read 56.5 ml plus or

minus 1.5 ml. If the test indicates the instrument's cylinder output is within the acceptance tolerance, as described, record "OK."

### Breath Test Reagent Ampoule Control Number

A random sample from each ampoule batch in use at the department will be tested. Record ampoule control lot number(s).

### Optical System

Inspect for proper operation of the following:

#### Lights

1. balance light
2. red "Empty" signal light
3. green "Full" signal light
4. green "Read" signal light (Breathalyzer Model 900A only)

### Time Delay Circuit (Breathalyzer Model 900A only )

Check ninety second time delay with a watch/clock (plus or minus five seconds).

### Mechanical Balance

Insert unopened ampoules into the instrument, turn balance light on and balance the system. Turn balance light off and then on again. Galvanometer/Nullmeter needle should remain balanced on center line.

### Galvanometer/Nulllmeter Action

With ampoules inserted into the instrument and the system balanced, place blood alcohol pointer on 0.00. Using the balance wheel, with the balance light activated, rotate the balance wheel so that the blood alcohol pointer moves to 0.40 and then returns to 0.00. Leaving the ampoules in the instrument and the system balanced, place the blood alcohol pointer on 0.40. Using the balance wheel, with the balance light activated, rotate the balance

wheel so that the blood alcohol pointer moves to 0.00 and then returns to 0.40. Galvanometer/Nullmeter action should show a smooth, free movement to the right and to the left.

If all tests of the instrument's optical system are working satisfactorily, then record "OK."

### Balance Lost Motion

Move the blood alcohol pointer across the entire blood alcohol scale. Movement should be free and smooth.

With ampoules in the instrument and the system balanced, place the blood alcohol pointer on 0.20. Using the balance wheel, with the balance light activated, rotate the balance wheel so that the pointer moves to 0.00 and then return to a position of balance. Lost motion on the blood alcohol pointer scale should read no more than plus or minus 0.005 of 0.20. Repeat the procedure moving the pointer from 0.20 to 0.40. Lost motion on the blood alcohol pointer scale should read no more than plus or minus 0.005 of 0.20. If these tests indicate the instrument's balance lost motion is within the acceptance tolerance described, record "OK."

### Instrument Temperature

With the instrument at operating temperature, remove instrument's thermometer, insert test thermometer and confirm instrument's temperature is 50 degrees Celsius, plus or minus 3 degrees Celsius. Remove test thermometer and insert instrument's thermometer. If test indicates the instrument's temperature is within the acceptance tolerance described, record "OK."

### Breath Alcohol Simulator Solution Percentage

Record the lot number and simulator solution vapor percentage. A 500 ml container of simulator solution will be used for no more than fifty (50) exhalations, inclusive of clearing air from the simulator head space.

*Instrument Test Percentage Results*

Simulated breath tests will be conducted with a random sample from the control lot number of each ampoule batch in use at the department.

Simulated breath tests will be conducted with reference and test ampoules of the same batch number.

A minimum of two test ampoules will be used and tested per inspection.

To provide an additional check of the instrument linearity, three simulated breath tests will be conducted on each test ampoule.

To insure proper temperature of the simulator solution vapor sample (34 degrees Celsius, plus or minus 0.2 degrees Celsius), atomizers will *not* be used.

At each location, prior to performing the first simulated breath test, breath will be exhaled in a continuous, moderate flow through the simulator for approximately five seconds to eliminate head space air. Then the instrument breath tube will be attached to the simulator.

The blood alcohol pointer will be placed at 0.00 before introducing the simulator solution vapor sample into the instrument. Prior to all simulated breath tests, the instrument will be purged.

A simulator solution vapor sample will be introduced into the instrument by exhaling breath in a continuous, moderate flow for approximately ten seconds.

After delivering the vapor sample, the instrument breath tube will be removed from the simulator and the simulator breath tube will be attached to the simulator outlet port.

Simulated breath tests will be recorded as acceptable, if all the test results are within a 0.010 of each other and fall within the range of 0.090 and 0.105 (acceptance tolerance).

Instrument test percentage results will be recorded as " *See Below." If the results of all the tests are within the acceptance

tolerance, then record, *e.g.,* "6 Tests Within Acceptable Tolerance," on the last line of the Radio Transmission Testing section of the certificate.

## *RADIO FREQUENCY INTERFERENCE (RFI) CHECK*

RFI testing will be conducted on Breathalyzer Model 900A instruments only. All tests will be conducted in accordance with New Jersey State Police Radio Frequency Interference Testing Procedures for Breathalyzers, dated May 5, 1983.

### *Instrument Location*

List room where Model 900A is located. For Breathalyzer Model 900 instruments, record "N/A."

### *Background Check*

For Model 900A instruments, record "Yes" if a background check has been made in accordance with RFI testing procedures. For Breathalyzer Model 900 instruments, record "N/A."

### *Effect/No Effect*

After background check is completed, check appropriate block.

### *Remarks*

After background check is completed, record remarks, if necessary. If no remarks are necessary, leave blank.

### *Above Instrument is Not RFI Sensitive*

For Model 900A instruments, leave this block blank. For Breathalyzer Model 900 instruments, place an "X" in block.

### *Radio Transmission Testing*

Background, base station, mobile and portable radio checks will be made on Model 900A instruments at the time they are placed into

service. Thereafter, only background and base station radio checks will be made unless one of the following conditions occur:

1. A change in the department's radio operating frequencies or power output.
2. A change in the position, location or type of base station antenna.
3. Major repairs or calibration of the instrument.
4. A change in the operating location or general position of the instrument.
5. A change in the general background RFI environment of the instrument.

### Operating Frequency

List the complete operating frequency number for the channel.

### Channel Designation

List the channel designation for the corresponding operating frequency number. Abbreviations may be used as necessary.

### Base Station

If radio frequency interference occurs, record "E" (effect). Explain results in "Remarks" column and take appropriate action.

If no radio frequency interference occurs, record "N/E" (no effect).

If there is no base station operation of corresponding operating frequency, record "N/A."

### Mobile Distance

Record "N/E" (no effect) and the distance at which there is no effect. Record "N/A" if mobile transmission testing is not performed, or if there is no mobile use of corresponding operating frequency.

### Portable Distance

Record "N/E" (no effect) and the distance at which there is no effect. Record "N/A" if portable transmission testing is not performed, or if there is no portable use of corresponding operating frequency.

## REMARKS & CERTIFICATION

### Remarks

If Remarks are unnecessary, record the word "None."

Situations that warrant an explanation will be recorded under "Remarks" such as:

1. malfunctions
2. complaints (founded/unfounded)
3. instrument placed into or removed from service
4. reassignments
5. repairs
6. other comments as needed

When a malfunction occurs, the Coordinator will list the malfunction(s), repair(s), or correction action(s) taken, and record *one* of the following statements:

1. The existence of this/these malfunction(s) would make adherence to the check-off list impossible.
2. The existence of this/these malfunction(s) would not have affected test results.
3. The existence of this/these malfunction(s) would have produced erroneously low test results.
4. The existence of this/these malfunction(s) would have affected test results.

### Repaired/Inspected

Place an "X" in both boxes when repairs have been performed.

Place an "X" in the inspected box when no repairs are performed or necessary.

### Date

Spell month, *e.g.*, August 4, 1995.

### Name & Badge Number

Coordinator's full rank, first name, middle initial, last name and badge number will be recorded.

*Signature*

Coordinator will sign name.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.