792 A.2d 457 (2002)
348 N.J. Super. 455
STATE of New Jersey, Plaintiff-Respondent,
v.
Mark CLEVERLEY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted January 30, 2002.
Decided February 27, 2002.
*458 Peter M. O'Mara, Red Bank, attorney for appellant.
Thomas F. Kelaher, Ocean County Prosecutor, attorney for respondent (Thomas Cannavo, Assistant Prosecutor, on the brief).
Before Judges CONLEY, A.A. RODRIGUEZ and LISA.
The opinion of the court was delivered by LISA, J.A.D.
We are called upon to determine in this case whether a revision in the standard protocols for use by State Police coordinators in testing breathalyzers affects the admissibility in evidence in driving while intoxicated (DWI) prosecutions of the Breath Test Inspectors' Inspection Certification (BTIIC) to establish that the breathalyzer was in proper working order. Defendant contends the BTIIC's should not have been admitted in his trial because the State failed to present evidence to establish the reliability of the revised protocol, which was utilized by the coordinator in this case. We disagree and affirm defendant's conviction of a per se violation of N.J.S.A. 39:4-50. We also affirm defendant's conviction on the alternate ground of violating N.J.S.A. 39:4-50 without regard to the breathalyzer reading.
At 11:26 p.m. on October 1, 1999, a police officer, standing outside his vehicle, observed defendant driving without his headlamps on. He gestured to defendant to turn on his lights but to no avail. He got into his vehicle, followed defendant a short distance, and pulled him over uneventfully. Defendant began to exit his vehicle twice without authorization from the officer, who instructed him each time to remain in the vehicle until directed otherwise. After the officer completed his call-in of the stop, he approached defendant and instructed him to exit his vehicle. The officer immediately detected a strong odor of alcohol on defendant's breath. The officer instructed defendant to walk to the rear of his van. As he did so, the officer observed the defendant was swaying as he walked. Suspecting defendant of being intoxicated, the officer directed him to perform the leg raising test. The area of the roadway was level and the weather was clear. The officer first demonstrated the test. Defendant was unable to successfully perform it, touching his raised foot to the ground four times and touching his van for balance. Defendant was slurring his speech. The officer informed defendant he believed he was intoxicated and he was under arrest. Defendant became argumentative and resistant. The initial officer and an assisting officer obtained physical control of defendant, handcuffed him and transported him to the station.
Defendant voluntarily submitted to a breathalyzer test, which resulted in two readings of .17% blood alcohol content (BAC). At trial, the parties stipulated that the breathalyzer operator was properly qualified and that he administered the breathalyzer test properly. Defendant objected to the admissibility of the before and after BTIIC's, reflecting tests performed on August 5, 1999 and October 5, 1999 on the breathalyzer used on defendant. The basis of the objection was that in testing the breathalyzer, the coordinator did not follow the protocol approved by our Supreme Court in State v. Garthe, 145 N.J. 1, 678 A.2d 153 (1996), but instead *459 followed a revised protocol, effective October 1, 1997, and that the State failed to produce evidence to establish the reliability of the revised protocol.
The municipal court judge admitted the BTIIC's over defendant's objection and found him guilty of a per se violation of N.J.S.A. 39:4-50(a) because the breathalyzer readings established he operated a vehicle with a BAC of .10% or more. The judge alternatively found the evidence established defendant's guilt for operating his vehicle while under the influence of intoxicating liquor based upon the credible testimony by the arresting officer of his observations of defendant, without regard to the breathalyzer evidence. Defendant was sentenced as a second offender to pay a $500 fine and all other mandatory monetary assessments, two year loss of driving privileges, thirty days of community service and forty-eight hours in the Intoxicated Driver Resource Centers program.
On appeal to the Law Division, after a trial de novo, the Law Division judge also rejected defendant's arguments that the BTIIC's were inadmissible and again found defendant guilty of a per se violation of N.J.S.A. 39:4-50(a) and also, alternatively, of driving while under the influence of intoxicating liquors. The same sentence was reimposed.
A breathalyzer test result is admissible in a DWI prosecution only if it is first established that "the breathalyzer instrument is in proper working order, is administered by a qualified operator and is used in accordance with accepted procedures." Romano v. Kimmelman, 96 N.J. 66, 82, 474 A.2d 1 (1984). The State bears the responsibility for establishing all conditions of admissibility, id. at 91, 474 A.2d 1, by clear and convincing proof. Id. at 90, 474 A.2d 1. Defendant challenges only the first condition of admissibility. That condition is typically satisfied by admission of the BTIIC as a business record, N.J.R.E. 803(c)(6), or as a record, report or finding by a public official, N.J.R.E. 803(c)(8), properly authenticated, N.J.R.E. 901, and on proper advance notice to the defendant of intent to offer it, N.J.R.E. 807. State v. McGeary, 129 N.J.Super. 219, 226-28, 322 A.2d 830 (App.Div.1974).[1]
Our Supreme Court has determined that the protocols established by the State for testing breathalyzers must be designed to ensure the machine will produce reliable results, State v. Garthe, supra, 145 N.J. at 9, 678 A.2d 153, but that the adoption of those protocols is more akin to a State Police intra-agency determination than rulemaking. Id. at 7, 678 A.2d 153. Therefore, adoption or modification of the protocols need not comply with the Administrative Procedure Act. N.J.S.A. 52:14B-1 to-24. In Garthe, the Court appended to its opinion a copy of the then-existing protocols, State v. Garthe, supra, 145 N.J. at 15-23, 678 A.2d 153 (Appendix B), and determined that they "meet the [State v. Matulewicz, 101 N.J. 27, 499 A.2d 1363 (1985)] standards for admissibility in terms of `objectivity ... regularity ... routine quality,' and absence of any `motive to single out a specific analysis for the purpose of rendering an untrustworthy report.'" Id. at 13, 678 A.2d 153, (quoting State v. Matulewicz, 101 N.J. at 30, 499 A.2d 1363). Because there was no evidence presented to establish that the protocols are not scientifically reliable, BTIIC's prepared pursuant to them would be admissible. Id. at 13-14, 678 A.2d 153. The Court noted "there is *460 nothing in the record that questions the `circumstantial probability of [the BTIIC's] trustworthiness.'" Id. at 12, 678 A.2d 153, (quoting State v. Matulewicz, supra, 101 N.J. at 29-30, 499 A.2d 1363). The Court considered it "fair to take judicial notice of the case law that has described the substance of those test procedures that lend objective reliability to the BTIIC's." Ibid.
After Garthe was decided, the Superintendent of State Police amended the protocols contained in the Garthe appendix, effective October 1, 1997. The change implicated here involves the use of an atomizer rather than the coordinator's breath in testing the breathalyzer. The previous protocols provided:
To insure proper temperature of the simulator solution vapor sample (34 degrees Celsius, plus or minus 0.2 degrees Celsius), atomizers will not be used.
At each location, prior to performing the first simulated breath test, breath will be exhaled in a continuous, moderate flow through the simulator for approximately five seconds to eliminate head space air. Then the instrument breath tube will be attached to the simulator.
....
A simulator solution vapor sample will be introduced into the instrument by exhaling breath in a continuous, moderate flow for approximately ten seconds.
[Id. at 19, 678 A.2d 153 (Appendix B).]
At the trial in this case, defendant produced the amended protocols, which contain the following modifications to the above provisions:
At each location, prior to performing the first simulated breath test, the atomizer will be attached to the simulator input tube. Five compressions of the atomizer will be introduced to the simulator to eliminate head space air. Then the instrument breath tube will be attached to the simulator output port.
....
A simulator solution vapor sample will be introduced into the instrument by five (5) compressions of the atomizer.
Defendant first contends that because the protocols "approved" by the Court in Garthe have been modified, the State must produce evidence in the trial of his case to establish the reliability of the modified procedure. We disagree. Garthe does not stand for the proposition that the protocols in existence at that time were immutable. Indeed, because the court determined that the protocols do not constitute rulemaking, but are an internal action of the State Police, their periodic modification, without public notice and comment, is unremarkable.
Defendant's remaining arguments are twofold. He contends he was wrongfully denied discovery regarding experiments conducted by the State Police in developing the modification. He further contends the expert testimony he produced at trial sufficiently undermines the purported reliability of the modified procedure to defeat the State's burden of establishing the good working order of the breathalyzer, tested under that procedure, by clear and convincing proof.
Our analysis of both arguments begins with the reasons expressed by the State Police for revising the protocols. The endnotes to the revision state:
This Standard Procedure, which is the Standard Procedure reviewed and accepted by the New Jersey Supreme Court in its decision in State v. Garthe, 145 N.J. 1, 678 A.2d 153 (1996), rehearing den. ____ N.J. ____ (1996), and reflected in Appendix B of that decision, Id. at 15-23, 678 A.2d 153, is being revised to reflect changes deemed appropriate by the Chief Forensic Scientist *461 of the Division of State Police, and which are consistent with appropriate and accepted scientific procedures.
The endnotes further state:
The specific changes in the standard procedure for the use of 0.10 Percent Breath-Alcohol Simulator Solution as traceable control testing standard for a simulated breath test are:
I. Instead of a Breath Test Coordinator blowing air into the breath test instrument through a Simulator, a rubber bulb pump (referenced in the Standard Procedure as an "atomizer") will be used to introduce approximately 200ml-300ml of air through a Simulator into the breath test instrument being inspected and tested. This reduces the depletion of alcohol per simulated breath test by a factor of 4 to 6 times. Earlier concerns about the need to either use breath or preheat the air passed into the Simulator were adequately addressed in "Evaluation of Commercial Breath Alcohol Simulators Further Studies," K.M. Dubowski and N.A. Essary, Journal of Analytical Toxicology, 15 (1991) 272. An earlier paper by Dr. Dubowski, "Breath-Alcohol Simulators: Scientific Basis and Actual Performance," K.M. Dubowski, Journal of Analytical Toxicology, 3 (1979) 177, provides a theoretical basis and an experimental verification of the relationship of air volume, number of tests, and depletion of Breath-Alcohol Simulator Solution as a testing standard.
II. The number of times a Breath Test Coordinator will use a particular bottle of 0.10 Percent Breath Test Simulator Solution is reduced from 50 to 30. This will reduce depletion by 40%.
III. The combination of reduced volume per simulated breath test and reduced number of simulated breath tests reduces the depletion during the use of the 0.10 Percent Breath Test Simulator Solution to under 1%, thus producing a maximum change from this source of 0.001% BAC.
It is apparent that the purpose of these changes was to reduce the potential depletion of the simulator solution used in testing breathalyzers, thereby enhancing the accuracy and reliability of the test. A fair reading of these comments reveals that depletion will be reduced in two ways: by controlling and limiting the volume of air used in each test, by using five compressions of an atomizer, rather than utilizing a "moderate" exhale of human breath for an approximate number of seconds, and by reducing from fifty to thirty the maximum number of tests for which each container of simulator solution may be used.
The latter provision is consistent with concerns expressed in State v. Slinger, 281 N.J.Super. 538, 658 A.2d 1299 (App.Div.1995). Defendant does not challenge this. The former provision, use of the atomizer, is based on scientific studies of Dr. Dubowski, who has been recognized by our courts as "a leading authority on the scientific reliability of the breathalyzer." State v. Downie, 117 N.J. 450, 461, 569 A.2d 242, cert. denied, 498 U.S. 819, 111 S.Ct. 63, 112 L.Ed.2d 38 (1990). It is this provision that defendant challenges.
Defendant produced Dr. Richard Saferstein, former chief forensic scientist for the New Jersey State Police. Dr. Saferstein emphasized that he takes no exception to the use of an atomizer, and acknowledged that the National Highway Traffic Safety Administration has adopted a protocol using a similar device, an air pump, in place of human breath. He expressed the concern, however, that because the vapor generated by the simulator solution is temperature-dependent, the use of room temperature air through an atomizer instead of human breath could *462 affect the accuracy of the breathalyzer test reading. He explained that the vapor is generated by heating the simulator solution to thirty-four degrees Celsius, which is approximately equal to the temperature of human breath, ninety-eight degrees Fahrenheit. Use of room temperature air, approximately seventy-two degrees Fahrenheit, could have the effect of reducing the alcohol content in the vapor entering the breathalyzer, which could then result in a false reading of the instrument within the acceptable range. He also questioned whether five compressions of the atomizer is sufficient to achieve temperature equilibrium.
Dr. Safferstein opined that in the absence of in-house testing by the State Police to validate the reliability of test results utilizing the atomizer, the use of the atomizer is scientifically unreliable. He produced no results of any experiments performed by him or anyone else nor any scientific publications that discredit the use of the atomizer. He acknowledged that both the manufacturer of the breathalyzer and simulator devices, Draeger Safety, Inc. and Guth Laboratories, have issued written approvals of the use of the atomizer in lieu of human breath.
Finally, Dr. Saferstein acknowledged that the order of magnitude of the breathalyzer reading deviation he might expect under the new procedure would be in the.01 to .015 range. He thus conceded that "certainly the error that I'm talking about would not have been anywhere near the magnitude that would have caused [defendant's.17] reading to be less than .10 percent." Yet he insists the asserted error could result in a false "acceptable" reading in the test. If, for example, .08 was actually entering the machine, and the machine recorded a reading of .09 (which is within the acceptable range of .09 to.105), "on the surface it would look like everything was all right but in fact the instrument would be reading slightly high because the true reading should have been.08." Thus, he concludes, that machine should not have passed the test and should not have been certified to be in good working order.
The coordinator who tested the breathalyzer used in this case testified that he has performed thousands of tests under the old protocols (using his breath) and thousands more under the new protocols (using the atomizer). He has observed no difference "with the testing with the new procedure and the old one, all the results have been within the acceptable tolerance and there has been no changes in actual readings."
The coordinator also testified that he and other coordinators had gone to the State Police laboratory in West Trenton to conduct a "volume check" in the use of the atomizer. Presumably this was done in conjunction with the issuance of the revised protocols. He squeezed the atomizer five times, forcing air into a measuring device. He performed this test four times and "pumped 250 cc's on [all] four occasions." This, of course, is consistent with the endnote goal "to introduce approximately 200ml-300ml of air through a Simulator into the breath test instrument being inspected and tested." The coordinator was not aware whether the results of this procedure were recorded.
Prior to trial, defendant made a discovery motion seeking the results of any tests or experiments conducted by the State Police in conjunction with the new protocols. The municipal prosecutor took the position that he was unaware of any such materials and thus could not produce them. The municipal judge agreed, declined to issue a discovery order, and suggested that defendant subpoena any such records, if they exist. Defendant apparently *463 did not do so, asserting, instead, that the State is required to produce evidence of in-house testing establishing the reliability of the new procedure to meet its burden of proof on the first Romano prong.
We are satisfied from our review of the record that the State has met its burden. "Absent any such evidence that the test protocols established by the Division and State are not scientifically reliable to establish that breathalyzer machines are in proper operating order," BTIIC's shall be admissible in DWI trials. State v. Garthe, supra, 145 N.J. at 13-14, 678 A.2d 153. Dr. Saferstein's testimony was patently insufficient to undermine the reliability of the revised testing procedure and amounted to no more than speculation. The concerns he raised, the temperature differential and air volume, were specifically addressed in the endnotes, in reliance on published studies by Dr. Dubowski. The new procedure accords with manufacturer recommendations, see id. at 7, 678 A.2d 153, and is generally consistent with a procedure adopted by the National Highway Traffic Administration. The empirical results are compelling. If the suspected error hypothesized by Dr. Saferstein actually existed, surely readings outside the acceptable range would have occurred in at least some of the thousands of tests performed with the atomizer.
We therefore conclude that the BTIIC's were properly admitted into evidence, and defendant's per se violation was established with proper evidence.
We are also satisfied that the record contains substantial credible evidence to support the finding by the Law Division judge that defendant was driving while under the influence of intoxicating liquors, without regard to the breathalyzer reading. State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964). Defendant's driving at night without his headlamps on and the observations of the officer were sufficient to establish that defendant "imbibed to the extent that his physical coordination or mental faculties [were] deleteriously affected." Id. at 165, 199 A.2d 809.
Affirmed.
NOTES
[1] The corresponding evidence rules cited in McGeary are N.J. Evid. R. 63(13), 63(15), 67 and 64.