15 A.3d 829

IN THE MATTER OF THE PROVISION OF BASIC GENERATION
SERVICE FOR THE PERIOD BEGINNING JUNE 1 2008.

Argued October 12, 2010—Decided March 10, 2011.

340

*Stefanie A. Brand,* Director, argued the cause for appellant Division of Rate Counsel (*Ms. Brand,* attorney; *Ms. Brand, Ronald K. Chen,* and *Diane Schulze,* on the briefs).

*Babette Tenzer,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Tenzer* and *Kenneth J. Sheehan,* Deputy Attorney General, on the brief).

*Gregory Eisenstark and James H. Laskey* argued the cause for respondents (*Mr. Eisenstark,* attorney for Public Service Electric and Gas Company, PSEG Energy Resources & Trade LLC; *Norris, McLaughlin & Marcus,* attorneys for Independent Ener-

gy Producers of New Jersey; *Skadden, Arps, Slate, Meagher & Flom,* attorneys for J.P. Morgan Ventures Energy Corporation; *Morgan, Lewis & Bockius,* attorneys for Jersey Central Power & Light Company; *Riker Danzig Scherer Hyland & Perretti,* attorneys for Consolidated Edison Energy, Inc.; *Dickstein Shapiro,* attorneys for Conectiv Energy Supply, Inc.; *Bevan, Mosca, Giuditta & Zarillo,* attorneys for Constellation Energy Commodities Group, Inc. and Constellation NewEnergy, Inc.; *Mr. Eisenstark, Mr. Laskey, Andrew Muscato, Marc B. Lasky, James C. Meyer, Nicholas W. Mattia, Jr.,* and *Murray E. Bevan,* on the joint brief).

Justice LaVECCHIA delivered the opinion of the Court.

The central issue in this appeal is the procedural claim by the Department of the Public Advocate, Division of Rate Counsel (Rate Counsel), that the Board of Public Utilities (BPU) failed to comply with basic notice and opportunity for comment obligations before taking an action, by administrative order, that paved the way for potentially $50 million in increased energy supplier costs to be passed through to ratepayers. Rate Counsel claims that by conflating two separate proceedings, the BPU lost sight of its duty to provide interested parties with fair notice that the agency was considering such specific action, and failed to allow those parties an opportunity to comment and be heard.

The Appellate Division affirmed the action of the BPU, rejecting Rate Counsel's procedural argument in part based on *N.J.S.A.* 48:2–46, which insulates a BPU order from being set aside by a reviewing court unless it "clearly appears that there was no evidence before the board to support the same reasonably" or unless procedural irregularities or the informality of the proceedings "tends to defeat or impair the substantial right or interest of appellant." *In re Provision of Basic Generation Serv. for the Period Beginning June 1, 2008,* 411 *N.J.Super.* 69, 85, 984 *A.*2d 437 (2009) (quoting *N.J.S.A.* 48:2–46). The panel was not convinced that the statutory standard was demonstrated. *Id.* at 85–88, 984 *A.*2d 437. However, we do find significant irregularity in

these proceedings that impaired the interest of the rate-paying public.

Here the BPU's actions blurred the lines between distinct proceedings. In the instant proceeding, the BPU had an obligation to provide the regulated parties and the public with the formality of notice and opportunity to comment before adopting the pass-through policy that directly impacted the interests of ratepayers. That a single comment in a separate proceeding introduced a question about handling the increased costs in issue and two other late arriving comments in the instant proceeding also raised questions about the topic did not relieve the agency of its obligation. We hold that in the muddled circumstances that transpired, the duty to provide clear notice that would enable a meaningful opportunity for comment is incumbent on the agency itself. The BPU was not entitled to rely on the comments of private parties to satisfy its basic administrative law obligation to act with transparency through the provision of prior notice and opportunity for comment.

I.

A brief summary of the dual BPU proceedings at issue is required to begin our discussion. On January 19, 2007, the BPU published notice that it intended to review its Renewable Energy Portfolio Standards (RPS). The review dealt largely with a transition from the use of rebates to the use of market-based incentives to encourage solar renewable energy. As part of RPS, electricity producers previously had the option to either produce a minimum percentage of renewable energy, or to pay a solar alternative compliance payment (SACP), set at $300 per megawatt-hour (MWH).

On September 12, 2007, the BPU announced that the SACP would increase to $711 per MWH, and would decline annually over an eight-year period at specified amounts. In a comment filed *at that September 12 proceeding,* Jersey Central Power & Light Company (JCP&L) asked whether suppliers with existing con-

tracts would be subject to the higher SACP through the duration of those pre-existing contracts. The September 12 announcement of the cost increase did not address how existing contracts would be treated, nor did the December 6, 2007 Order memorializing that cost increase.

In a parallel set of proceedings that commenced in 2007, the BPU engaged in the annual review of its auction format for provision of Basic Generation Service (BGS). The review occurred pursuant to the Electric Discount and Energy Competition Act (EDECA), *N.J.S.A.* 48:3–49 to –98.1, which vests the BPU with authority to oversee a shift to a more competitive marketplace for power. The yearly auctions allocate to electricity providers three-year contracts to supply BGS power to residential and small business customers, with one-third of the total electrical load auctioned in a given year.

On September 20, 2007, the BPU held a hearing on proposals for different auction formats. Final comments were due on September 28. Independent Energy Producers of New Jersey (IEPNJ) notified the BPU that its comments would be late, and emailed them to a BPU staff member on September 30. One of its points addressed the BPU's September 12 decision in the SACP proceedings, and advocated that the winners of three-year contracts in the 2006 and 2007 auctions should be protected from the increase in SACP costs. It suggested two possibilities: that previous contracts be grandfathered at the prior $300/MWH rate for SACP payments; or that suppliers be allowed to pass through the cost increase to ratepayers. Public Service Electric and Gas Company (PSE&G) also submitted a comment on September 30 regarding the BPU's SACP decision, and suggested, in line with IEPNJ's first proposed solution, that existing contracts be grandfathered at the $300 SACP level.

At a November 8, 2007 meeting that was open to the public, but in which the public could not participate, the BPU established an auction schedule. During that proceeding, a staff member of the Board raised the concerns of PSE&G and IEPNJ that had been

expressed via the comments. Combining the two suggestions
made in the IEPNJ comment, the staff member stated that
"[s]uppliers are seeking to have those prior contracts grandpar-
ented so that ratepayers, rather than suppliers, will bear the
additional cost . . . ." Not differentiating between the suggestion to
grandparent the contracts at the former lower rate of $300 and
the alternative suggestion of passing through to ratepayers the
higher cost to suppliers if "grandparenting" were not permitted,
the board members discussed the two alternatives as if they were
one:

> President Fox: Why are we grandparenting?
>
> . . .
>
> [Board Staff Member] Mr. Perrotti: The reason why we're grandparenting is prior
> to those BGS suppliers participating in those auctions the rate was at $300. So I
> guess it was anticipated at that time that, you know, they were either going out
> purchasing something or just including the $300 in the contract. I guess when you
> changed the cap to $711 I guess it left some uncertainty in their mind that now
> they would have—or now they would have to pay the higher cost. We are just
> strictly erring on the side . . . that a regulatory uncertainty that, you know, they
> were led to believe this was not the case prior to those auctions and not[,] it's
> changed. . . . I think these suppliers knew in the rules that they very well could
> have seen an increase in the level.
>
> Commissioner Fiordaliso: I think by grandfathering it in—
>
> President Fox: You could vote that.
>
> Commissioner Fiordaliso:—you're being fair and I think that's the bottom line.
>
> Mr. Perrotti: Because otherwise we could have very easily went the other way and
> just said you need to absorb these costs. It's a risk and you should have maybe
> foreseen that risk.
>
> President Fox: And I think it is a fairness thing.

In a January 25, 2008 Order, the BPU announced that it agreed
with the suppliers who sought to have existing contracts "grand-
parented," and explained that it would allow a "pass through to
ratepayers" for the costs of alternative compliance payments
above the $300 level. It is against that backdrop that we address
the lack of notice argument advanced by Rate Counsel in these
administrative law proceedings.

## II.

### A.

Certain basic principles of administrative law bear emphasis in this matter. First and foremost is the recognized awareness that regulatory law "has [an] elasticity that permits it to adapt to changing circumstances and conditions," *Glukowsky v. Equity One, Inc.*, 180 *N.J.* 49, 67, 848 *A.*2d 747 (2004), *cert. denied*, 543 *U.S.* 1049, 125 *S.Ct.* 864, 160 *L.Ed.*2d 770 (2005), and a flexibility that allows agencies "the ability to select those procedures most appropriate to enable the agency to implement legislative policy." *In re PSE & G's Rate Unbundling, Stranded Costs & Restructuring Filings*, 167 *N.J.* 377, 385, 771 *A.*2d 1163 (2001) (quoting *Texter v. Dep't of Human Servs.*, 88 *N.J.* 376, 385, 443 *A.*2d 178 (1982)). Administrative agencies enjoy great leeway when selecting among rulemaking procedures, contested hearings, or hybrid informal methods in order to fulfill their statutory mandates. *See Nw. Covenant Med. Ctr. v. Fishman*, 167 *N.J.* 123, 137, 770 *A.*2d 233 (2001); *see also In re Request for Solid Waste Util. Customer Lists*, 106 *N.J.* 508, 519, 524 *A.*2d 386 (1987) (describing adjudicatory hearings, rulemaking, hybrid proceedings and informal agency action). With hybrid proceedings, an agency can utilize proceedings that "possess[ ] characteristics of both adjudication and rulemaking." *Texter, supra*, 88 *N.J.* at 385, 443 *A.*2d 178.

That said, administrative agency action, and an agency's discretionary choice of the procedural mode of action, are valid only when there is compliance with the provisions of the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15, and due process requirements. *Nw. Covenant Med. Ctr., supra*, 167 *N.J.* at 137, 770 *A.*2d 233.

### B.

The APA, which is the "touchstone for decision in formulating fair administrative procedures," *High Horizons Dev. Co. v. Dep't*

*of Transp.,* 120 *N.J.* 40, 46, 575 *A.*2d 1360 (1990), provides the necessary starting point for any analysis of an agency's chosen pathway for action. It defines an "administrative adjudication" or "adjudication" as "any and every final determination, decision or order made or rendered in any contested case." *N.J.S.A.* 52:14B–2(c). In turn, a "contested case" is defined by the APA as

> a proceeding ... in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing[.]

> [*N.J.S.A.* 52:14B–2(b).]

The "contested case" adjudicatory procedure requires notice, and a trial-type hearing. *N.J.S.A.* 52:14B–9; *N.J.S.A.* 52:14B–10; *see In re NJPDES Permit No. NJ0025241 Issued to Asbury Park City,* 185 *N.J.* 474, 481, 888 *A.*2d 454 (2006).

Here the agency's chosen mode of proceeding plainly was not adjudicative, a decision that the Appellate Division found justifiable. *See Provision of Basic Generation Serv., supra,* 411 *N.J.Super.* at 86–88, 984 *A.*2d 437. The BGS process was commenced through an order inviting comments regarding auction formats and did not implicate directly competing interests and relations of specific parties that would require resort to trial-type mechanisms in order for their resolution. That said, the BGS proceeding did result in the issuance of an order that appears to have had broad effect on the interests of regulated parties and the general public, and therefore we turn to the APA's rulemaking requirements.

The APA defines a "rule" as

> [E]ach agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.

> [*N.J.S.A.* 52:14B–2(e).]

■ Rulemaking is a legislative-like activity. *See In re Issuance of Permit by Dep't of Envtl. Prot. to Ciba–Geigy Corp.*, 120 *N.J.* 164, 171, 576 *A.*2d 784 (1990). It is "designed to take advantage of the agencies' resources and expertise" which make them uniquely suited for understanding and solving specialized problems. *Bergen Pines Cnty. Hosp. v. N.J. Dep't of Human Servs.*, 96 *N.J.* 456, 474, 476 *A.*2d 784 (1984). The purpose of the APA rulemaking procedures is "to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated." *In re Adoption of 2003 Low Income Hous. Tax Credit Qualified Allocation Plan*, 369 *N.J.Super.* 2, 43, 848 *A.*2d 1 (App.Div.), *certif. denied*, 182 *N.J.* 141, 861 *A.*2d 846 (2004).

■ Here the agency did not proceed in accordance with traditional rulemaking requirements for a rule proposal, including provision of notice and an opportunity to comment. *See N.J.S.A.* 52:14B–4(a).[1] However, that does not end the inquiry. Agencies should act through rulemaking procedures when the action is intended to have a "widespread, continuing, and prospective effect," deals with policy issues, materially changes existing laws, or

---

[1] The APA's section on rulemaking notice and opportunity to comment has specific requirements. Among them, an agency must give notice that it intends to adopt or amend any rule at least thirty days before the adoption of the regulation. *N.J.S.A.* 52:14B–4(a)(1). The notice must include a statement of the terms or substance of the intended action and the time, place and manner in which comments may be presented, and must be published in the New Jersey Register along with other means of public notice required by law. *Id.; see N.J.A.C.* 1:30–5.1(b)(9); *N.J.A.C.* 1:30–5.2(2). The agency must prepare a report for public distribution which provides a set of analyses of the expected impact of the proposed rule. *N.J.S.A.* 52:14B–4(a)(2). Interested persons must be given a reasonable opportunity to submit either orally or in writing "data, views, or arguments," and the agency must "consider fully all written and oral submissions respecting the proposed rule." *N.J.S.A.* 52:14B–4(a)(3). Finally, a report must be "[p]repare[d] for public distribution ... listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views and arguments contained in the submissions." *N.J.S.A.* 52:14B–4(a)(4).

when the action will benefit from rulemaking's flexible fact-finding procedures. *Metromedia, Inc. v. Div. of Taxation,* 97 *N.J.* 313, 329–31, 478 *A.*2d 742 (1984); *see N.J.S.A.* 52:14B–2(e); *Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot.,* 191 *N.J.* 38, 54, 921 *A.*2d 1122 (2007). Specifically, a court should apply the following multi-factor analysis to determine whether rulemaking requirements are implicated:

> [A]n agency determination must be considered an administrative rule ... if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
>
> [*Metromedia, supra,* 97 *N.J.* at 331–32, 478 *A.*2d 742.]

Not all factors need be present for an agency action to qualify as an administrative rule. *Id.* at 332, 921 *A.*2d 1122. The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule. *See State v. Garthe,* 145 *N.J.* 1, 6–7, 678 *A.*2d 153 (1996). In this matter, the required qualitative assessment leads to the conclusion that the BPU should have adhered more closely to rulemaking procedures when moving forward with its January 2008 Order.

■ Turning to the first factor, one could argue that the approval of the pass-through of costs applied to a narrow group, namely electricity suppliers and electricity distribution companies that had entered into basic generation contracts in the 2006 and 2007 auctions. However, because those electricity suppliers and electricity distribution companies represent a segment of the regulated public, and because the pass-through will impact the

general public in its rate-paying capacity, the first *Metromedia* factor would support closer adherence to rulemaking procedures. Also, the BPU's January 2008 Order is to be "applied generally and uniformly to all similarly situated persons," *Metromedia, supra*, 97 *N.J.* at 331, 478 *A.*2d 742, so the second *Metromedia* factor is applicable.

As for the third *Metromedia* factor, the January 2008 Order only applies to existing basic generation contracts. Although it is prospective in the sense that it establishes a framework that will be applied in the future in respect to those individual parties, it is not prospective in the sense that it will not necessarily apply to controversies or parties in unrelated future proceedings. Regardless, insofar as the BPU's policy decision does fill in statutory gaps, the agency cannot avoid rulemaking obligations by framing a potentially far-reaching policy choice as if it only applied to the instant parties.

In this vein, the fourth factor supports viewing the Order as rulemaking because there was no statutory direction on how a BPU decision to raise solar alternative compliance payments would affect already settled basic generation contracts and the BPU had not taken a position on the issue previously. Similarly, the policy decision reflected in the Order "was not previously expressed in any official and explicit agency determination, adjudication or rule." *Metromedia, supra*, 97 *N.J.* at 331, 478 *A.*2d 742 (factor five); *cf. Garthe, supra*, 145 *N.J.* at 7, 678 *A.*2d 153 (concluding that breathalyzer machine procedures did not require rulemaking when relevant legal standard derived from case law); *In re Att'y Gen.'s "Directive on Exit Polling: Media and Non–Partisan Pub. Interest Groups"*, 402 *N.J.Super.* 118, 136–37, 952 *A.*2d 1127 (App.Div.2008) (finding that rulemaking requirements not implicated because agency directive did not materially change past Attorney General position, despite presence of other factors indicating that directive constituted rulemaking), *aff'd in part and modified in part on other grounds*, 200 *N.J.* 283, 981 *A.*2d 64 (2009).

Finally, as for *Metromedia* factor six, the decision to pass through the costs to ratepayers might be viewed as a "general policy" which was to be applied later in individual rate-recovery hearings. *See N.J. Animal Rights Alliance v. N.J. Dep't of Envtl. Prot.*, 396 *N.J.Super.* 358, 369–70, 934 *A.2d* 52 (App.Div.2007) (management policy implicated matter of general policy when it specified details necessary to conduct public bear hunt). However, because the policy was formulated in regard to a single determination of how to allocate costs,[2] it also might be viewed as not implicating a more "general policy" of the agency. Being that sound arguments exist in both directions, this factor does not advance the analysis in any compelling way.

In sum, the preponderance of *Metromedia* factors favor treating the BPU Order as akin to rulemaking. The BPU's pass-through decision, embodied in the January 2008 Order, bore sufficient similarity to a rule such that many of the administrative due process safeguards that attach to formal agency rulemaking procedures, and the reasons therefor, were here implicated. In adopting this quasi-rule, the BPU was entitled to greater flexibility with regard to procedural formalities than if this process could only have been completed by way of a strict rulemaking process. Nonetheless, for the reasons explained below, the means chosen by the BPU for promulgating its rule-type order were insufficient to meet even a lower threshold of process—specifically a minimum level of notice and opportunity for comment—for those affected.

III.

A.

Even though the BPU did not strictly comply with the APA's rulemaking procedures in this case, we must decide whether the BPU's approximation of a rulemaking procedure to estab-

---

[2] We are well aware that the governing statute for renewable energy portfolio standards has been amended and that multi-year contracts posing similar issues as those presented in this matter should not arise again. *See L.* 2009, *c.* 289.

lish a "rule" which would govern pass-through of costs in future rate-setting hearings was insufficient because it completely lacked an evidentiary hearing. As the appellate panel below stressed, "the Board's decision was not a rate increase but rather a policy decision since it did not approve any particular rate increase or mechanism." *Provision of Basic Generation Serv., supra,* 411 *N.J.Super.* at 86–87, 984 *A.*2d 437. The issue here dealt with forecasts of the behavior of actors in the utility industry. In cases such as this, in which there are no material facts in dispute, it would unduly hamper the regulatory process if agencies were required to hold evidentiary hearings before any general rule could be established to govern rate-setting cases.

However, the allocation proceedings required under the framework established by the BPU are a different matter. The pending BPU rate-recovery proceeding will establish the methodology for reviewing the rate increases justified by the pass-through, and then there will be actual cases in which this methodology of review will be applied. The procedural hybrid created by the BPU's paradigm, which had attributes of rule-making and adjudicative proceedings and included a legislative-type hearing, two opportunity-to-comment periods, discovery periods, and public hearings throughout the state, was sufficient to satisfy the requirements of the EDECA, the APA, and due process, as long as evidentiary rate-setting hearings take place which apply to the cases of specific energy providers the principles to be established in the ongoing *In re Provision of Basic Generation Service (BGS) for the Period Beginning June 1, 2008—BGS SREC Recovery Mechanism Proceeding,* BPU Docket No. ER07060379.

### B.

Rate Counsel also asserts that the January 2008 Order lacked an adequate statement of reasons regarding the pass-through decision because it did not provide an explanation why it chose to apply the solar alternative compliance payment increase to the 2006 and 2007 basic generation auction contracts when not doing

so would have both prevented regulatory uncertainty and not raised rates. Standing alone, the Board's order might well be a sufficiently adequate statement of its reasoning. However, the lack of adequate notice in this case is further asserted to render the BPU's decision arbitrary and capricious because the lack of notice denied Rate Counsel an adequate opportunity to make the BPU aware of superior alternatives to the pass-through of costs. In this light, the failure to provide a more meaningful statement of reasons is the result of a procedurally arbitrary process, and evidence of the asserted procedural failings to which we now turn.

### C.

The central administrative due process question, informed by our *Metromedia* analysis, is whether the BPU afforded a level of process to affected parties consonant with the Order's many indicia of a rule. Rate Counsel contends that the BPU violated the ratepayers' due process rights of notice and an opportunity to be heard because, when the BPU announced that the proceedings at issue would determine the format of a basic generation service auction, there was no mention or implication that the BPU's raising of the costs of solar alternative compliance payments in another, separate BPU proceeding would be addressed, and definitively so, by shifting the costs to ratepayers. Despite the BPU having received the comments of IEPNJ and PSE&G urging "grandparenting" of the increased SACP costs, the BPU plainly failed to issue in the instant proceeding any notice and opportunity for comment on the IEPNJ and PSE&G's suggestions about "grandparenting" and/or pass-through of the higher SACP contract rates to ratepayers.

The joint respondents in this appeal urge adoption of a principle that Rate Counsel be deemed aware of "the exact same issue in two contemporaneous and overlapping BPU dockets" when the Rate Counsel is an active participant in both proceedings.[3] Rate

---

[3] It bears repeating that JCP&L first raised the issue in the parallel SACP hearing, although the BPU failed to address it in its subsequent December 6,

Counsel, on the other hand, rails against that suggestion, noting that because it is statutorily authorized to be a party to every rate-implicating proceeding before the Board, *N.J.S.A.* 52:27EE–48(a), it could easily be taken unawares by proposals hidden in comments that refer to issues in two separate proceedings.

Plainly, as the Appellate Division commented, "the issues raised here cannot be considered in a vacuum. Cost and responsibility has been the subject of varied proceedings before the Board for an extended period of time." *Provision of Basic Generation Serv., supra,* 411 *N.J.Super.* at 90, 984 *A.*2d 437. However, even in the separate *Renewable Energy Portfolio Standards—Alternative Compliance Payments and Solar Alternative Compliance Payments Proceeding,* BPU Docket No. EO06100744, only an inquiry about existing contracts was raised and the BPU's eventual order, dated December 6, 2007, did not address the issue. In the interim between comment and order in that proceeding, the late arriving comments were filed in this proceeding, wherein a possible pass-through of solar alternative compliance payment costs to ratepayers was suggested, albeit only as an alternative to another suggestion that called for grandfathering existing contracts at the former lower rate. The two suggestions were conflated in the discussion, noted above, that took place before the BPU on November 8 concerning the auction format.

While there certainly may be circumstances where an issue is of such central or pressing concern that parties to an administrative hearing will be presumed to have notice of it despite lack of *formal* notice, *see In re Hosps.' Petitions for Adjustment of Rates for Reimbursement of Inpatient Servs. to Medicaid Beneficiaries,* 383 *N.J.Super.* 219, 244–46, 891 *A.*2d 641 (App.Div.) (finding administrative due process satisfied when notice of agency position was provided by a series of appeals regarding the disputed agency position), *certif. denied,* 187 *N.J.* 82, 899 *A.*2d 304 (2006), here, the

2007 Order in that proceeding. At the time of the events discussed in this proceeding, that December 6, 2007 Order had not yet issued.

issue of solar compliance costs had not been broached by either the BPU when establishing parameters of the issues to be addressed in the auction review, or any party in the legislative-type public hearing devoted to the matter of the provision of BGS. Moreover, the discussion that ensued on November 8 did not enhance clarity on the precise issue of the pass-through.

Significantly, the possibility of the pass-through of solar renewable energy certificate costs was not such a pressing or looming concern in a proceeding devoted to the 2008 BGS contract auction procedures that notice of the possibility should be imputed to Rate Counsel. It is simply unfair to shift to Rate Counsel a duty to presume that the BPU might approve a pass-through of solar alternative compliance payment costs in the BGS proceeding because the issue had been raised in the separate pending solar alternative compliance payments proceeding and had been touched on by late-arriving comments in the distinctly separate instant auction review.

A ready standard exists for determining when new considerations enter into the regulator's deliberations such that they require a renewal of notice before taking final action that adopts a new and different-than-proposed legislative-type action. The law governing how different a proposed rule can be from a final rule under the New Jersey APA's rulemaking notice and opportunity-to-comment requirements provides useful guidance for the instant matter, where the decision contained such strong *Metromedia* indicia of a rule. The APA's entire thrust works to avoid an abrogation of "the value of the original notice of rule-making" that occurs when there is substantial alteration of a "rule between proposal and promulgation." *In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C. 7:27–23*, 239 *N.J.Super.* 407, 414, 571 *A*.2d 971 (App.Div.1990). As an authority on state administrative rulemaking has warned, the opportunity for public participation in rulemaking secured by notice and comment periods

would be meaningless ... if an agency were allowed to adopt a rule that had no substantial relationship to the rule originally proposed in the required public notice. Under those circumstances an agency could circumvent opposition to a proposed rule by intentionally omitting from its text, at the time it was initially published as a proposal, those portions that are likely to be controversial. Then, at the time of its adoption, the agency could rewrite the rule to incorporate the controversial provisions that would have provoked a public outcry had they been known at the time the rule was originally proposed.

[Arthur Earl Bonfield, *State Administrative Rule Making* § 6.7.1 at 232 (1986).]

In this State, our administrative law protocols require that "[w]hen material changes in the text of a proposed rule occur after initial publication and before adoption of the final rule, the agency must issue and publish further notice seeking comments prior to adoption of the final version of the rule." *In re Regulation of Operator Serv. Providers*, 343 *N.J.Super.* 282, 335, 778 *A.*2d 546 (App.Div.2001). *N.J.A.C.* 1:30–6.3 provides guidance on when a change reflected in the final regulation requires a new notice and new comment period. In pertinent part, the provision reads:

In determining whether the changes in the proposed rule are so substantial, consideration shall be given to the extent that the changes:

1. Enlarge or curtail who and what will be affected by the proposed rule;

2. Change what is being prescribed, proscribed or otherwise mandated by the rule;

3. Enlarge or curtail the scope of the proposed rule and its burden on those affected by it.

[*N.J.A.C.* 1:30–6.3(b).]

Although we have not addressed *N.J.A.C.* 1:30–6.3, several Appellate Division opinions have. The Appellate Division has described the test to be applied when determining if a new notice and comment opportunity is necessary in a rulemaking as follows: "whether the agency so substantially changed the adopted rule from the proposed rule that interested persons lacked adequate notice of the agency's action. Or, stated another way, considering the rule the agency adopted, the question is whether the proposal notice adequately advised interested persons of the agency's adoption." *In re Adoption of N.J.A.C. 9A:10–7.8(b)*, 327 *N.J.Super.* 149, 155, 742 *A.*2d 997 (App.Div.2000).

Plainly, the rule must be implemented using common sense. An agency that responds to comments and "wishes to modify its proposed action because of comments received" should not be condemned "to indefinite and endless re-proposals." *Ibid.* Only substantial changes require re-notice and re-publication, else "the proceedings may never be terminated." *In re Appeal of Adoption of N.J.A.C. 7:7A–1.4,* 240 *N.J.Super.* 224, 228, 573 *A.*2d 162 (App.Div.1989), *rev'd on other grounds,* 118 *N.J.* 552, 573 *A.*2d 143 (1990) (citation and internal quotations omitted). Although stated in the federal administrative law setting, the following observation is importable to the purposes that underlie our APA: When an agency requests comments on a proposal, "if the agency then alters its course in response to the comments it receives, little purpose would be served by a second round of comment[,]" *Am. Water Works Ass'n v. EPA,* 40 *F.*3d 1266, 1274 (D.C.Cir.1994), unless the change is so substantial as to render valueless the original notice. When there is a substantial change from the noticed proposal, "the comments of other interested parties do not satisfy an agency's obligation to provide notice." *Nat'l Black Media Coal. v. FCC,* 791 *F.*2d 1016, 1023 (2d Cir.1986) (finding notice inadequate even when proposed change in rule was discussed in comments). "[N]otice necessarily must come—if at all—from the agency." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 *F.*2d 506, 549 (D.C.Cir.1983).

In our judgment that rule is sensible and on point in this case. Parties are expected to focus their attention on the agency; it is unrealistic to expect parties to monitor the comments of all other interested parties, although plainly, some well-heeled participants may be able to do so. A process that would permit gamesmanship in the filing of comments should be discouraged. It simply is not reasonable "to presume that . . . isolated comments would come to the notice of other parties." *Am. Fed'n of Labor v. Donovan,* 757 *F.*2d 330, 340 (D.C.Cir.1985).

### D.

What the BPU should have done to avoid the confusion of issues and conflation of proceedings that occurred here was to issue a new, clear notice of its intention to consider one or the other, or both suggestions as to the increased SACP costs before finalizing the auction format. That new complication deserved highlight, and a meaningful opportunity for comment by interested parties, not the least of whom was the rate-paying public, potentially on the hook for an estimated $50 million. Here the notice of the pass-through Order entered by the BPU was simply inadequate.

Notice that the BPU might approve a decision to pass through to utility ratepayers costs associated with the increased price of solar alternative compliance payments was derived, if at all, initially from a proceeding outside of the instant BGS proceeding. The BPU provided no indication, while there was still an opportunity to comment on the auction review, that it was contemplating such a decision. There is very little, if any, connection between the crafting of the rules of the auction, which would determine the BGS contracts starting June 1, 2008, and the decision that affected the costs of already determined basic generation contracts.[4] This is surely a case in which the final rule-like action impermissibly

---

[4] Although the BPU asserts that the auction process always was structured to have, as an overriding fundamental, the avoidance of uncertainty by bidders, and that that well-known concern permissibly animated its decision in this matter, its argument is overstated. The origin of the concern about uncertainty lies in the BPU's December 11, 2001 Decision and Order in *In re Provision of Basic Generation Service Pursuant to the Electric Discount and Energy Competition Act, N.J.S.A. 48:3–49 et seq.*, BPU Docket No. EX01050303, which noted that bidders would be risk averse. This point was made in the context of explaining the importance of having the BPU establish and stick to a Board approval process and timetable. The 2001 Order that first established the auction process did not speak more broadly to a concern about uncertainty such that it provides support for the BPU's argument in this matter. That the initial crafting of the auction rules and the decision to pass through costs both similarly invoke the need to create clear rules and minimize regulatory uncertainty does not so entwine the separate decisions as to make one an obvious corollary of the other.

"[e]nlarg[ed] . . . the scope of the proposed rule and its burden on those affected by it." *N.J.A.C.* 1:30–6.3(b)(3).

An order authorizing the pass-through of costs in the already settled contracts, accomplished in this proceeding, could not have been anticipated based on the notice provided by the BPU. The only possible source of notice that a pass-through was under consideration in the instant proceeding came from the comments submitted by PSE&G and IEPNJ, which did raise the issue of the impact of the increase in solar alternative compliance payment costs on pre–2008 BGS contracts. As noted, those two comments had requested a "grandparenting" of existing contracts, and one had requested a pass-through of costs as well. Yet, the BPU itself never sought comment on the validity of the request or even how to handle the request for "grandparenting" of the former energy contract rates, although at least two different methodologies can be found in comments. Instead, the BPU went ahead and entered the Order under challenge, which required suppliers to incur the higher contract costs but permitted them to foist onto ratepayers the new and higher contract rate. We deem the comments of those other interested parties who raised the issue to be inadequate notice rendering the proceedings below procedurally arbitrary and capricious.

Indeed, we specifically reject the argument advanced by the BPU and the respondents that Rate Counsel was aware and involved in both proceedings and, therefore, cannot claim surprise about an issue that bridged the two proceedings. As Rate Counsel notes, the BPU has many proceedings that involve overlapping parties, and Rate Counsel especially is a recurring party due to its statutory responsibility to represent the interests of ratepayers in rate matters before the BPU. *See N.J.S.A.* 52:27EE–48(a). That parties may overlap should not excuse a lack of diligent notice compliance by the BPU. Rather, that feature of BPU proceedings should make careful compliance with notice and meaningful opportunity-for-comment responsibilities all the more important: The regularity of entities' appearances in the myriad proceedings

being conducted at any time before the BPU should not permit a breakdown in the formal requirements of notice. Otherwise, as here, proceedings would become conflated, issues would become confused, and due process deprivations would result.

We therefore find irregularity in these proceedings that impaired the interest of the rate-paying public. *See N.J.S.A.* 48:2–46. It was the BPU's obligation to provide notice to potentially interested parties that such a policy-laden, discretionary decision was under consideration, and to allow a meaningful opportunity for comment on how to handle the increased cost for energy suppliers.

That said, Rate Counsel's actions in this matter can hardly be extolled. It would have been much preferable for Rate Counsel to have sought a stay and reconsideration promptly before the BPU, or the Appellate Division if unsuccessful before the BPU, instead of simply appealing. That lack of effort could well have cost Rate Counsel any relief in this matter but for our concern for the public interest. The comment period for *In re Provision of Basic Generation Service (BGS) for the Period Beginning June 1, 2008– BGS SREC Recovery Mechanism Proceeding,* BPU Docket No. ER07060379, has now ended although the BPU has not issued a decision in the matter. The Rate Counsel argues that that currently ongoing rate-recovery mechanism proceeding will not cure the prejudice arising out of the lack of an initial hearing regarding the pass-through of costs to ratepayers because the rate-recovery proceeding will not revisit the underlying question of whether there should be a rate increase. Rate Counsel's contention regarding the inadequacy of the recovery mechanism proceeding is supported by the comments that have been submitted in that proceeding. It appears that none question the premise that there should be a pass-through of the unanticipated rise in solar alternative compliance payment costs.

Thus, the only opportunity to have the BPU hear, consider, and explain why this cost should be passed through to ratepayers is in connection with a reexamination of the January 2008 Order under

review. Rate Counsel has presented a credible explanation of how, if given the opportunity, it would have criticized the pass-through decision. The lack of an opportunity to present its arguments was certainly prejudicial.

In sum, although the BPU decision was not reached through a formal rulemaking procedure, the case law discussing the rule-making due process requirements of notice and opportunity to comment provides applicable guidance in this case, where the BPU order contains such strong indicia of a rule. In this context, as a matter of due process we must vacate the decision authorizing the pass-through of costs to ratepayers pending a new BPU proceeding addressing the subject. We so order.

In insisting that the BPU turn square corners in its provision of adequate notice of its possible actions affecting ratepayers, we do not engage the agency in idle gestures. Requiring a new legislative-type proceeding on the topic at this time will provide Rate Counsel with the opportunity to dissuade the BPU from shifting these costs from suppliers. As the BPU acknowledged at oral argument, although the suppliers already have incurred these costs, the BPU retains the choice to require suppliers to shoulder the costs rather than pass them through to ratepayers. The BPU must now make its decision afresh, but in light of the circumstances as they exist presently, where the BGS suppliers have in good faith completed their electricity purchase contracts as negotiated. Even if the BPU chooses the same course as before, it will be incumbent upon the agency to explain its reasons for rejecting Rate Counsel's argument on behalf of the rate-paying public.

IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the BPU to commence the process anew, in order to provide the regulated parties and the public with notice and an opportunity to comment on the proposed pass-through of increased energy supplier costs.

*For reversal and remandment*—Justices LONG, LaVECCHIA and RIVERA–SOTO, and Judges STERN and RODRIGUEZ (temporarily assigned)—5.

*Opposed*—None.

*Not Participating*—Chief Justice RABNER, and Justices ALBIN and HOENS—3.