**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4246-16T1
                  A-4248-16T1

E.D.,

      Petitioner-Appellant,

v.

HORIZON NJ HEALTH, and
DEPARTMENT OF HUMAN SERVICES,
DIVISION OF MEDICAL ASSISTANCE
AND HEALTH SERVICES,

      Respondents-Respondents.

_____

I.W.,

      Petitioner-Appellant,

v.

HORIZON NJ HEALTH, and
DEPARTMENT OF HUMAN SERVICES,
DIVISION OF MEDICAL ASSISTANCE
AND HEALTH SERVICES,

      Respondents-Respondents.

_____

Argued October 29, 2018 – Decided December 7, 2018

Before Judges Gooden Brown and Rose.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Robert A. Robinson argued the cause for appellant E.D. (Disability Rights New Jersey, attorneys; Susan Saidel and August Pozgay, on the briefs).

Robert A. Robinson argued the cause for appellant I.W. (Disability Rights New Jersey, attorneys; Iraisa C. Orihuela-Reilly, Susan Saidel and August Pozgay, on the briefs).

Angela Juneau Bezer, Deputy Attorney General, argued the cause for respondent Division of Medical Assistance and Health Services (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Angela Juneau Bezer, on the briefs).

PER CURIAM

In these matters, calendared back to back and consolidated for purposes of issuing a single opinion, petitioners E.D. and I.W. challenge separate final agency decisions of the Department of Human Services (DHS), Division of Medical Assistance and Health Services (DMAHS), reducing their personal care assistance (PCA) services. On appeal, petitioners primarily claim DMAHS's decisions were arbitrary and capricious because reduction in their PCA services was not triggered by a change in their medical conditions. Instead, petitioners

contend their PCA services were reduced because their health management provider utilized an assessment tool that the agency failed to promulgate pursuant to the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15. We disagree and affirm both decisions.

I.

We glean the pertinent facts and procedural history from the record reviewed by the Director of DMAHS, supporting both decisions.

A.

E.D. is an adult woman diagnosed with cerebral palsy and several other medical conditions. She lives with her immediate family, including her mother and primary caretaker, S.D. In 2014, E.D. began receiving PCA benefits through the Personal Preference Program (PPP) to assist her with performing activities of daily living (ADLs).[1] At that time, she was qualified to receive forty hours of PCA services per week.

In December 2015, Horizon, E.D.'s health management provider, conducted its mandatory reassessment "to reevaluate the beneficiary's need for continued personal care assistance services" under the program. N.J.A.C. 10:60-

---

[1] The PPP allows a participant to receive a cash grant for reimbursement of the costs of a personal care assistant of his or her choice, often a family member or a friend. See N.J.A.C. 10:60-3.2.

3.5(a)(3). Horizon representative, Corina Scurko, R.N., conducted a face-to-face evaluation of E.D., utilized the current PCA Nursing Assessment Tool (PCA Tool), and concluded that E.D. required 35.32 hours of PCA services per week.

Thereafter, E.D. requested a Medicaid fair hearing to contest the reduction, and the matter was transmitted to the Office of Administrative Law (OAL). Prior to the hearing, Julie Banks, R.N., conducted an independent assessment of E.D., and determined E.D. required 41.6 hours of PCA services per week.

Scurko testified at the OAL hearing on behalf of Horizon. She indicated her scoring was based on the PCA Tool, which state employees have utilized since approximately January 2015. According to Scurko, the PCA Tool assigns scores for the "level of help . . . need[ed] for each [ADL] activity."

Pertinent to E.D.'s appeal, Scurko discussed her assessment regarding feeding, meal preparation and shopping. Specifically, Scurko subtracted three meals per week from E.D.'s total amount of weekly meals because, "She attends a program three days per week where she has lunch." For meal preparation, Scurko allotted ten minutes per meal because E.D.'s food must be chopped. Scurko did not allot the maximum time permitted for total meal preparation.

Scurko allotted ten out of a maximum twenty minutes per meal for feeding since E.D. could eat meals prepared by her family and does not have any special dietary requirements. Notably, S.D. "did not tell [Scurko] that [E.D.] needed an excessive amount of time to eat each meal or be fed each meal." E.D.'s PCA hours were also reduced in the grocery shopping category. Scurko testified that she did not allot any time for those activities because S.D. and E.D. reside in the same household.

Further, Scurko testified that the reduction in total hours of PCA services was based on a change in the PCA Tool, and not a change in E.D.'s condition. Scurko elaborated that the previous PCA Tool "was not as specific" as the current tool "as far as adding up minutes for each task." The current tool specifies a particular amount of minutes for each ADL, "so it is much more accurate than the previous tool . . . ."

In addition to S.D.'s testimony detailing her daughter's condition and daily needs, Banks testified on behalf of E.D. and explained her in-home assessment. In the ADL category of feeding, Banks allotted twenty minutes for breakfast and lunch, and thirty minutes for dinner, without deducting for the three feedings when E.D. attended her daycare program. Unlike Scurko, Banks also included time for meal preparation for the days E.D. attended daycare because the meals

still must "be prepped at home -- chopped and packaged to go to daycare." For total meal preparation, Banks awarded fifty minutes per day because E.D. has "food preferences" and her food must be "mechanically altered." Regarding shopping, Banks allotted thirty minutes per day since E.D. "does [not] eat the same as what the family gets . . . [and] needs her own supplies."

On March 6, 2017, an Administrative Law Judge (ALJ) issued an initial decision, ultimately finding, "There is no indication that E.D.'s . . . ADL needs for PCA services have changed since the prior assessments in 2014 and 2015." In doing so, the ALJ reasoned, "The forty hours of PCA services are consistent with what DMAHS provided in the past and [Horizon] has failed to show by a preponderance of the credible evidence, a change in need has occurred, or that the previous approval occurred in error." The ALJ also "question[ed] the efficacy of [the PCA T]ool in the absence of publication as a violation of Metromedia, Inc. v. [Director, Division] of Taxation, 97 N.J. 313, 331 (1984)."

Horizon filed exceptions to the ALJ's initial decision. On April 24, 2017, DMAHS issued a final agency decision, modifying the ALJ's initial decision. Specifically, the Director reversed Horizon's reduction of services from forty to thirty-five hours, and determined E.D. required thirty-eight hours of PCA services per week. Specifically, the Director found "no justification to award

additional time for [shopping] when [S.D.] is already shopping for the whole family." The Director also disagreed with the ALJ that meal preparation required more than ten minutes allotted by Scurko, since E.D. "has no special dietary needs and is able to eat the same food that her mother prepares for the rest of the family." Ten minutes was sufficient time to chop E.D.'s food before feeding. Finally, the Director determined that because E.D. is at risk for choking, she should be allotted twenty minutes of feeding assistance per meal, except for the three meals provided at daycare.

B.

I.W. is an adult man diagnosed with autism and other disabilities. He lives with B.W., his mother and primary caretaker. I.W. maintains a paid part-time job, but requires assistance with his ADLs. In 2013, I.W. began receiving PCA benefits through the PPP to assist him with performing his ADLs. At that time, he was qualified to receive twenty-one hours of PCA services per week.

In January 2016, Horizon performed its routine reassessment of I.W. Horizon representative, Kevin Finkelstein, R.N., conducted a face-to-face evaluation of I.W., utilized the PCA Tool, and reduced I.W.'s PCA services from twenty-one hours to fourteen hours per week.

7

Thereafter, I.W. requested a Medicaid fair hearing to contest the reduction, and the matter was transmitted to the OAL. Prior to the hearing, Linda Schnolis, R.N., conducted an independent evaluation of I.W.'s PCA needs and determined I.W. required 33.9 hours of PCA services per week.

Finklestein testified at the OAL hearing on behalf of Horizon.[2] Relevant to I.W.'s appeal, Finkelstein explained the 120-minute discrepancy between his and Schnolis' report pertaining to the feeding category. In particular, since I.W. only required supervision, Finkelstein allotted half of the maximum amount of time permitted by the PCA Tool, deducting the five lunches I.W. ate outside the home. Finkelstein allotted sixty minutes per week for housekeeping because the current PCA Tool recommends 120 minutes per week divided by two, i.e., accounting for the number of people comprising the household. Further, Finkelstein did not allot time for grocery shopping or meal preparation because B.W. did not only shop and cook for I.W., but also shopped and cooked for herself. Finkelstein noted that I.W. had no special dietary restriction warranting time for meal preparation. Finally, pursuant to the PCA Tool's laundry category,

---

[2] The ALJ who conducted I.W.'s hearing was not the same ALJ who conducted E.D.'s hearing.

Finkelstein allotted forty-five minutes, which is the maximum time permitted when the washing machine is located in the home.

PCA Authorization Supervisor, Francine Grady, R.N., also testified on behalf of Horizon. Grady explained that the current PCA Tool was implemented in January 2015 because "the previous tool was not as cut and dry" and "left more room for subjective opinion by the staff." According to Grady, the assessing nurse may exceed the maximum time in any category, provided there is justification for doing so, and the total time allotted does not exceed forty hours per week. Extenuating circumstances necessitating more than forty hours of PCA services per week, such as a beneficiary's immobility, require approval by the Division of Disability Services (DDS).

In addition to B.W.'s testimony detailing her son's condition and daily needs, Schnolis testified on behalf of I.W. and explained her findings from her in-home assessment. Schnolis allotted time for feeding based on the complexity of the meal: ten minutes for breakfast, fifteen minutes for lunch, deducting the days I.W. eats at work, and thirty minutes for dinner. Schnolis allotted more time than Finkelstein in the housekeeping category because B.W. did all the housekeeping, which amounted to approximately fifteen minutes per day. Unlike Finkelstein, Schnolis allotted time for grocery shopping, which she

9

deemed required forty minutes round-trip travel time. Further, if I.W. accompanied B.W., additional time was necessary for cueing and monitoring to ensure B.W. does not interact with other shoppers. Schnolis justified a greater allotment of time for laundry because B.W. did the laundry herself, and I.W. changed his clothes four times a day.

On March 13, 2017, the ALJ issued an initial decision, concluding Horizon failed to demonstrate I.W.'s condition "in any way changed and required less than [twenty-one hours a week of PCA services.]" Because of the discrepancy between the assessments made by I.W. and Horizon, the ALJ conducted his own evaluation using the criteria in the PCA Tool.

Specifically, in awarding time for grocery shopping, the ALJ noted, "While I recognize that food shopping is done by B.W. and is done primarily at the same time that she does her shopping, B.W. needs additional items in the store that she would not be buying for herself . . . ." For the housekeeping category, the ALJ determined I.W. required ten minutes daily for the cleaning of his bedroom and personal space. The ALJ allotted more time for laundry because I.W. "could never independently learn the [laundry] process" and "he creates a considerable amount of laundry . . . ." Finding all of the PCA services

awarded were authorized by N.J.A.C. 10:60-3.3, the ALJ granted I.W. twenty-one hours of PCA services per week.

Horizon filed exceptions to the ALJ's Initial Decision. On May 15, 2017, the Director issued a final agency decision, modifying the ALJ's initial decision. The Director determined I.W. required 16.5 hours of PCA services per week. In doing so, the Director agreed with the ALJ's decision to increase the amount of time for bathing and personal hygiene, however, she discerned no basis for awarding additional time for shopping "when [B.W.] is already shopping for herself." The Director also disagreed that I.W. should receive additional time for housekeeping and laundry since the washing machine was in-home and I.W. only required light daily housekeeping, which was included in Finkelstein's assessment. Finally, I.W. did not require more than ten minutes for meal preparation, as determined by Finkelstein, because I.W. "has no special dietary needs and is able to eat the same food that [B.W.] prepares for herself." The Director did, however, increase the number of meals I.W. received at home.

These appeals followed.

II.

A.

Our role in reviewing agency decisions is significantly limited. R.S. v. Div. of Med. Assist. & Health Servs., 434 N.J. Super. 250, 260-61 (App. Div. 2014). "An administrative agency's decision will be upheld 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Id. at 261 (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). In determining whether agency action is arbitrary, capricious, or unreasonable, our role is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [Ibid. (citation omitted).]

"Deference to an agency decision is particularly appropriate where the interpretation of the [a]gency's own regulation is in issue." Ibid. (citation omitted). "Nevertheless, we are not bound by the agency's legal opinions." A.B.

12

v. Div. of Med. Assist. & Health Servs., 407 N.J. Super. 330, 340 (App. Div. 2009) (citation omitted). "Statutory and regulatory construction is a purely legal issue subject to de novo review." Ibid. (citing Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

Relevant here, when a head of an administrative body rejects or modifies an ALJ's findings of fact or conclusions of law, the reasons for doing so must be clearly stated. Dep't of Children & Families, Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 480 (App. Div. 2010) (citing N.J.S.A. 52:14B-10(c)); S.D. v. Div. of Med. Assist. & Health Servs., 349 N.J. Super. 480, 485 (2002). The new or modified findings must be supported by "sufficient, competent, and credible evidence in the record." Ibid.

## B.

Medicaid is a federally-created, state-implemented program that provides "medical assistance to the poor at the expense of the public." Estate of DeMartino v. Div. of Med. Assist. & Health Servs., 373 N.J. Super. 210, 217 (App. Div. 2004) (internal quotation marks omitted) (quoting Mistrick v. Div. of Med. Assist. & Health Servs., 154 N.J. 158, 165 (1998)); see also 42 U.S.C. § 1396-1. Although a state is not required to participate, once it has been accepted into the Medicaid program, it must comply with the Medicaid statutes

and federal regulations. Harris v. McRae, 448 U.S. 297, 301 (1980); United Hosps. Med. Ctr. v. State, 349 N.J. Super. 1, 4 (App. Div. 2002); see also 42 U.S.C. § 1396a(a)-(b).

The state must adopt "reasonable standards . . . for determining eligibility for . . . medical assistance . . . consistent with the objectives of the Medicaid program." Mistrick, 154 N.J. at 166 (internal quotation marks omitted) (quoting L.M. v. Div. of Med. Assist. & Health Servs., 140 N.J. 480, 484-85 (1995)), and "provide for taking into account only such income and resources as are . . . available to the applicant." N.M. v. Div. of Med. Assist. & Health Servs., 405 N.J. Super. 353, 359 (App. Div. 2009) (emphasis omitted) (citation omitted); see also 42 U.S.C. § 1396a(a)(17).

New Jersey participates in the federal Medicaid program pursuant to the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5. Eligibility for Medicaid in this State is governed by regulations adopted in accordance with the authority granted by N.J.S.A. 30:4D-7 to the Commissioner of the DHS. The DMAHS is the agency within the DHS that administers the Medicaid program. N.J.S.A. 30:4D-5; N.J.A.C. 10:49-1.1(a). Accordingly, the DMAHS is responsible for protecting the interests of the New Jersey Medicaid Program and its beneficiaries. N.J.A.C. 10:49-11.1(b).

14

C.

The program at issue here is the PPP for individuals with disabilities. Administered by the DDS, the PPP allows individuals to seek services best-suited to their unique circumstances. To qualify for participation, the individual must be both Medicaid eligible and already approved for PCA services. Covered PCA services include assistance with ADLs, such as: grooming, bathing, eating, dressing, and the like. N.J.A.C. 10:60-3.3(a)(1).

Consistent with the rigorous standards established for the types of services for which PCA payment is authorized, the standards governing individual eligibility for program participation are likewise rigorous. See, e.g., N.J.A.C. 10:60-3.1 to -3.10. Notably, the DDS reviews each request for services and sets forth the number of hours authorized. N.J.A.C. 10:60-3.9(b)(4).

Moreover, nursing reassessment visits are required to evaluate an individual's need for continued PCA services. N.J.A.C. 10:60-3.5(a)(3).[3] Therefore, an individual who has received approval for eligible services is not entitled to rely ad infinitum on the initial approval and remains subject to DDS reevaluation.

---

[3] When the present reassessments were performed, the regulation required a six-month reassessment. As of September 17, 2018, the regulation requires a yearly reassessment. See 50 N.J.R. 1992(b) (Sept. 17, 2018).

III.

Guided by the foregoing principles, and consistent with the factual record, we determine the Director's modified findings of fact, in both matters, are supported by sufficient, competent and credible evidence in the record. In each matter, the Director conducted an independent review of the record, increasing and decreasing hours where warranted, and relied on testimony that was not explicitly rejected by the ALJs. We defer to the agency's superior knowledge and expertise in the field. See Thurber v. City of Burlington, 191 N.J. 487, 502 (2007).

Additionally, for the reasons that follow, we find no merit to petitioners' arguments that DMAHS engaged in improper rulemaking by utilizing the current PCA Tool in reassessing their PCA services. See Metromedia, 97 N.J. at 331.

Generally, in exercising its delegated authority, an agency may act "informally, . . . or formally through rulemaking or adjudication in administrative hearings." Texter v. Dep't. of Human Servs., 88 N.J. 376, 383-84 (1982). Informal agency action "constitutes the bulk of the activity of most administrative agencies." In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 518 (1987). Such action involves any determination made without

a trial-type hearing. <u>Deborah Heart & Lung Ctr. v. Howard</u>, 404 N.J. Super. 491, 503 (App. Div. 2009).

Alternatively, an agency may act formally through rulemaking. <u>Id.</u> at 504. "Agencies should act through rulemaking procedures when the action is intended to have a 'widespread, continuing, and prospective effect,' deals with policy issues, materially changes existing laws, or when the action will benefit from rulemaking's flexible fact-finding procedures." <u>In re Provision of Basic Generation Serv.</u>, 205 N.J. 339, 349–50 (2011) (quoting <u>Metromedia</u>, 97 N.J. at 329–31).

In determining whether APA rulemaking requirements are implicated, we apply the factors established by our Supreme Court in <u>Metromedia</u>:

> [A]n agency determination must be considered an administrative rule . . . if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant

change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[97 N.J. at 331-32.]

"The factors need not be given the same weight, and some factors will clearly be more relevant in a given situation than others." Doe v. Poritz, 142 N.J. 1, 97 (1995). "Not all factors need be present for an agency action to qualify as an administrative rule." Provision of Basic Generation Serv., 205 N.J. at 350. "The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule." Ibid.

Although it concedes that the second and third Metromedia factors apply here, DMAHS contends that on balance, the remaining factors weigh against a finding that implementation of its current PCA Tool constituted rulemaking. We agree.

Specifically regarding the first factor, as DMAHS asserts, the PCA Tool is not unlike an "intra-agency memorandum," which the Supreme Court has recognized falls outside the scope of rulemaking. State v. Garthe, 145 N.J. 1, 7 (1996). In particular, in Garthe, the Court determined that State Police breathalyzer procedures are "more like an intra-agency memorandum than

rulemaking." Ibid. While these procedures "ultimately affect[] the general public, the agency action does not, in any sense, shape the conduct of the public." Ibid. Similarly here, the current PCA Tool assists health management providers with their assessment of PCA services. The current PCA Tool does not ultimately impact a beneficiary's conduct, medical condition, or needs. Rather, the primary function of the tool is to guide the assessment.

Considering the fourth Metromedia factor, we note that the current PCA Tool is structured according to the same categories set forth in N.J.A.C. 10:60-3.9(b)(2) (proscribing authorization for PCA services). Further, the current PCA Tool's guidelines, specifying the range of time that may be allotted for each category, comport with the regulation's express directive that health management providers calculate numerical scores based on the beneficiary's need. Ibid.

Nor does the current PCA Tool constitute a significant change from a clear, past agency position regarding the assessment of beneficiaries pursuant to Metromedia factor five. Although the current PCA Tool was implemented in January 2015, its predecessor, PCA Assessment Form FD-410, was substantively identical, apart from the added time guidelines in each category. The former tool contained values between one and three for each ADL, while

19

the current PCA Tool converts those values to a specific range of minutes for each task, resulting in a more precise measure of a beneficiary's need. Indeed, the current PCA Tool expressly indicates that "[t]he times listed for each activity are guidelines." As Grady testified, although the current PCA Tool is less subjective than its predecessor, the reviewing nurse still has some discretion in its application.

Finally, regarding the sixth <u>Metromedia</u> factor, implementation of the current PCA Tool does not reflect a decision or interpretation of law or general policy. Instead, the current PCA Tool is a flexible guideline based on existing regulations that have undergone the formal rulemaking procedure. In sum, although the current PCA Tool is different from the previous tool, it assesses the same categories, indicates that the maximum times listed for each activity are only guidelines, and allows for an override where appropriate.

On balance, we conclude the preponderance of the <u>Metromedia</u> factors favor treating the current PCA Tool as an informal agency action, rather than a product of formal rulemaking. <u>See</u> <u>Provision of Basic Generation Serv</u>., 205 N.J. at 352.

To the extent not specifically addressed, petitioners' remaining claims lack sufficient merit to warrant discussion in our written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4246-16T1