**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3314-17T2

ESTATE OF WINIFRED SKORSKI,

Appellant,

v.

NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY,

Respondent.

---

Argued March 4, 2019 – Decided March 20, 2019

Before Judges Sumners and Mitterhoff.

On appeal from the New Jersey Economic Development Authority.

Michael G. Sinkevich argued the cause for appellant (Lieberman & Blecher PC, attorneys; Stuart J. Lieberman and Michael C. Kondrla, of counsel; Michael C. Kondrla and Michael D. Sinai, on the briefs).

Laura Drahushak, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Laura Drahushak, on the brief).

PER CURIAM

Appellant, Estate of Winifred Skorski ("Estate"), appeals the New Jersey Economic Development Authority's ("EDA") final agency decision denying its application for a conditional hardship grant pursuant to the Underground Storage Finance Act, N.J.S.A. 58:10A-37.1 to -37.23 ("UST Act" or "the Act"). Under the Act, owners or operators of leaking underground petroleum storage tanks may receive grants or loans for the upgrade or closure of tanks and the remediation of contaminated properties. See N.J.S.A. 58:10A-37.49(a).[1] To receive a conditional hardship grant, an applicant, among other requirements, "cannot reasonably be expected to repay all or a portion of the eligible project costs if the financial assistance were to be awarded as a loan." N.J.S.A. 58:10A-37.5(c)(1).

The Act and its implementing regulations do not discuss applications by estates, but the EDA applies informal guidance contained in application materials to evaluate applications by estates. The Estate challenges this informal guidance, particularly a requirement that an estate's assets exceed its liabilities in order to qualify for a conditional hardship grant, as improper de facto

---

[1] The upgrade or closure of such tanks may be required by federal or state statutes. See N.J.S.A. 58:10A-37.4(a) (citing 42 U.S.C. 6991 to 6991(m) and N.J.S.A. 58:10A-21 to -35).

rulemaking that should have been subject to the formal rulemaking procedures of the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-1 to -31.

For the reasons that follow, we agree with the Estate that certain provisions of the EDA's informal guidance constitute improper de facto rulemaking and reverse the EDA's denial of the Estate's application.

I.

The UST Act and Implementing Regulations

The UST Act established the Petroleum Underground Storage Tank Remediation, Upgrade, and Closure Fund ("UST Fund") as a "special, revolving fund" administered by the EDA. N.J.S.A. 58:10A-37.3(a). The UST Fund is administered jointly by the New Jersey Department of Environmental Protection ("DEP") and the EDA. See N.J.S.A. 58:10A-37.12. Applicants seeking assistance from the UST Fund must first apply to the DEP for consideration of technical compliance with the cost guidelines developed by the DEP. N.J.A.C. 19:31-11.8(a). If the DEP deems the costs of the projects eligible, the EDA then evaluates the applicant's financial condition to determine eligibility for a grant or a loan. See N.J.A.C. 19:31-11.8 to -11.10.

The EDA "may award financial assistance from the fund to an eligible owner or operator in the form of a loan or a conditional hardship grant[.]"

N.J.S.A. 58:10A-37.5(a)(1). "A conditional hardship grant for eligible project costs of an upgrade, closure or remediation shall be awarded by the [EDA] based upon a finding of eligibility and financial hardship and upon a finding that the applicant meets the criteria set forth in this act." N.J.S.A. 58:10A-37.5(c)(1). By contrast, "[a] loan to an eligible owner or operator for the eligible project costs of an upgrade, closure, or remediation shall be awarded by the authority only upon a finding that the applicant other than a public entity is able to repay the amount of the loan." N.J.S.A. 58:10A-37.59(c)(2).

The Act provides two initial eligibility criteria for a conditional grant for remediation: (1) ownership of a qualifying tank; and (2) income and net worth limits:

> In order to be eligible for a conditional hardship grant for remediation, in the case of a regulated tank, the applicant shall have owned or operated the subject regulated tank at the time of tank closure. No applicant shall be eligible for a conditional hardship grant if the applicant has a taxable income of more than $250,000 or a net worth, exclusive of the applicant's primary residence and pension, of over $500,000. Any applicant with a taxable income of more than $200,000 who qualifies for a grant shall be required to pay no more than $1,000 of the eligible project costs.
>
> [Ibid.]

The Act provides additional criteria for evaluating financial hardship:

> A finding of financial hardship by the authority shall be based upon a determination that an applicant cannot reasonably be expected to repay all or a portion of the eligible project costs if the financial assistance were to be awarded as a loan. The amount of an award of a conditional hardship grant shall be the amount of that portion of the eligible project costs the authority determines the applicant cannot reasonably be expected to repay.
>
> [. . .] In making a finding of financial hardship for an application for the upgrade or remediation of a petroleum underground storage tank, where the petroleum underground storage tank is not a part of the business property of the owner, the authority shall base its finding upon the applicant's taxable income in the year prior to the date of the application being submitted.
>
> [Ibid.]

Accordingly, for an application not pertaining to a business property, a finding of financial hardship is based on: (1) "a determination that an applicant cannot reasonably be expected to repay all or a portion of the eligible project costs if the financial assistance were to be awarded as a loan" and (2) "the applicant's taxable income in the year prior to the date of the application being submitted." N.J.S.A. 58:10A-37.5(c)(1).

All recipients of loans, as well as recipients of a conditional hardship grant for a property other than the recipient's residence, are subject to a lien on the property in the amount of financial assistance awarded to the applicant. N.J.S.A.

58:10A-37.16(a). Recipients of a conditional hardship grant for a tank at the recipient's primary residence, however, are not subject to a lien on the property. Ibid.

For conditional hardship grants, the lien is "removed upon repayment of the amount of the grant that is unsatisfied or upon the end of a five-year period in which the site . . . continued to be operated in substantially the same manner as it was operated at the time of the award of financial assistance." N.J.S.A. 58:10A-37.16(c). In contrast, a recipient of a loan is required to repay the loan. N.J.S.A. 58:10A-37.16(b) ("A lien that is filed on real property pursuant to a loan shall be removed upon repayment of the loan.").

The EDA promulgated regulations to implement the UST Act. N.J.A.C. 19.31-11.1 to -11.14. The EDA's regulations provide that an applicant may receive a conditional hardship grant when the applicant meets: (1) eligibility requirements; (2) financial hardship requirement; and (3) statutory requirements of N.J.S.A. 58:10A-37.5(c). N.J.A.C. 19:31-11.6(b). With respect to the eligibility requirements, the regulations track the language of N.J.S.A. 58:10A-37.5(c)(1) regarding ownership of a qualifying tank and the income and net worth of the applicant. N.J.A.C. 19:31-11.6(b)(1).

Regarding financial hardship, similar to N.J.S.A. 58:10A-37.5(c)(1), the regulations provide:

> i. A finding of financial hardship by the Authority shall be based on a review of the applicant's financial condition and a determination that an applicant cannot reasonably be expected to repay all or a portion of the eligible project costs if the financial assistance were to be awarded as a loan.
>
> ii. The amount of an award of a conditional hardship grant shall be the amount of that portion of the eligible project costs the Authority determines the applicant cannot reasonably be expected to repay; however, any applicant with a taxable income of more than $200,000 who qualifies for a grant shall be required to pay no more than $1,000 of the eligible project costs[.]
>
> [N.J.A.C. 19:31-11.6(b)(2)(i) to (ii).]

The regulations, however, do not contain the UST Act's requirement that "where the petroleum underground storage tank is not a part of the business property of the owner, the authority shall base its finding [of financial hardship] upon the applicant's taxable income in the year prior to the date of the application being submitted." N.J.S.A. 58:10A-37.5(c)(1).

The EDA's Informal Guidance Regarding Applications by Estates

The parties agree that neither the UST Act nor the EDA's implementing regulations specifically address applications by estates. The Act defines "Owner" as "any person who owns a facility" and "Operator" as "any person in

control of, or having responsibility for, the daily operation of a facility." N.J.S.A. 58:10A-37.2 (emphasis added). The Act defines "Person" as "any individual, partnership, corporation, society, association, consortium, joint venture, commercial entity, or public entity, but does not include the State or any of its departments, agencies or authorities." Ibid. In its brief, the EDA notes it "has long interpreted the UST Act to include estates as eligible recipients of loans or hardship grants similar to other legally created entities that own property in need of remediation."

Accordingly, the EDA provides informal guidance regarding applications by estates in two documents provided to applicants who have received technical approval from the DEP. The first document, titled "Frequently Asked Questions Leaking Underground Storage Tanks" ("FAQ Sheet"), describes the following evaluation of financial hardship for an estate: "A determination of financial hardship with an Estate applicant . . . liabilities must exceed its assets inclusive of primary residence and pension plans (IRS recognized retirement plans, IRA, 401K) and the estate must not be settled." (ellipsis and emphasis in original).

The second document, titled "Estates" ("Estates Sheet"), provides more detailed guidance regarding the evaluation of applications by estates:

> I. In order to qualify for a grant from the Petroleum and Underground Storage Tank Program, an

applicant (Executor/Administrator applying on behalf of the Estate) must satisfy the following requirements:

1) Taxable Income – no more than $250,000
2) Net Worth – no more than $500,000 (excluding primary residence and pensions)
3) Must be a financial hardship
4) Meets statutory eligibility

II. The project site will be characterized based on its use at the time of the decedent's death (i.e. primary residence, a residence, or an investment property). Therefore . . .

1) if it was the decedent's primary residence, it will be excluded from the net worth test and no lien will be placed on the property.
2) if it was the decedent's residence at any time during the 12 months prior to the decedent's death, it will be included in the net worth test, but no lien will be placed on the property.
3) if it was an investment property (decedent did not reside there), it will be included in the net worth test and a lien will be placed on the property for 5 years and repaid on a pro-rate basis if the property is sold within the 5 years.

III. In order to satisfy the financial hardship test (mentioned above), the administration of the Estate must not yet be settled and Estate liabilities must exceed Estate assets.

> IV. If the Executor/Administrator has the authority to incur debt on behalf of the Estate, the Estate may be eligible to receive a loan.
>
> If the decedent passes away on or after the date of the current application to the NJDEP or NJEDA, criteria III does not have to be satisfied. The financial hardship test will be utilized based on an expense to income ratio.

<u>The Estate's Application</u>

On April 28, 2016, the Estate applied to the DEP for the costs incurred in the removal and remediation of a leaking underground storage tank located at a property in Bergen County (the "Property"). While the Estate's application was awaiting the DEP's technical compliance review, the Estate sold the property on July 20, 2016 and received $285,257.52 in proceeds from the sale.

On August 17, 2017, the DEP sent the Estate a letter informing its administrator that the DEP had determined that the Estate had satisfied the technical eligibility requirements to receive remediation costs in the amount of $70,524.07. The letter advised it did not "constitute any approval or release of funding" and that the EDA would contact the administrator in the coming weeks with a request for financial information. Accordingly, on August 21, 2017, the EDA sent the Estate application materials, including the FAQ Sheet and the Estates Sheet.

On October 10, 2017, the Estate submitted its application to the EDA. As part of the application, the Estate submitted a "Personal Finance Sheet" which listed the Estate's assets and liabilities. The Estate's assets, inclusive of the net proceeds from the sale of the Property, totaled $290,257.52. The Estate's liabilities, inclusive of the cost to remediate the property, totaled $214,533.14.

By letter dated November 9, 2017, the EDA advised the Estate that based on the review of the financial information submitted, the Estate was ineligible to receive grant funding. The letter stated: "The first two eligibility requirements have been satisfied, but the financial hardship test has not been satisfied because the Estate's assets exceed its liabilities." The letter informed the Estate that staff could review the application for consideration for a loan if the administrator had authority to incur debt on behalf of the Estate.

On December 11, 2017, the Estate's counsel sent a letter to the EDA requesting that the Estate's application be considered by the EDA Board. The letter argued that the financial hardship test applied to estates was unsupported by statute or regulation and was therefore "ultra vires and should be invalidated." The letter also informed the EDA that the Estate did not intend to pursue a loan.

The EDA Board considered the Estate's application on February 13, 2018. The Board voted to deny the Estate's conditional hardship grant application and

adopted a resolution incorporating its staff's memorandum. The memorandum reiterated that the financial hardship test was not satisfied because the Estate's assets exceeded its liabilities. Responding to the Estate's argument that the financial hardship test for estates was unsupported by regulation or statute, the memorandum stated:

> As explained earlier, the regulations describe the eligibility requirements for a conditional hardship grant and the basis for EDA's determination of financial hardship. The regulations, however, do not speak to the specific hardship requirements of an estate. An explanation of the specific documentation required from estates and the method in which the third hardship requirement applies to estates is set forth in the EDA's application documents and FAQs for the [petroleum underground storage tank] program. This documentation was provided to the Applicant. This documentation is also provided to all prospective applicants. Accordingly, staff applies the hardship test in the regulations in all cases, including any estate applicant. In re-assessing this application, staff reached the same conclusion that the Estate's assets exceeded its liabilities, and therefore did not present a financial hardship that would make it eligible for [petroleum underground storage tank] grant funding.

This appeal followed.

## II.

### A.

On appeal, the Estates raises the following arguments for our review:

I. THE EDA GUIDANCE DOCUMENTS ARE IMPROPER DE FACTO ADMINISTRATIVE RULEMAKING AND MUST BE STRICKEN IN THEIR ENTIRETY.

A. The UST Finance Act and its Implementing Regulations Do Not Support the EDA Guidance Documents' Financial Hardship Test.

B. According to Precedent, the EDA Guidance Documents Are Improper De Facto Administrative Rules.

C. Respondent's Actions are Ultra Vires and Violate All Estate Applicant's Constitutional Right to Due Process.

In general, our review of a final agency decision is limited to four inquiries:

> (1) whether the agency's decision offends the State or Federal Constitution;
>
> (2) whether the agency's action violates express or implied legislative policies;
>
> (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In Re Taylor, 158 N.J. 644, 656 (1999) (quoting Brady v. Bd. of Review, 152 N.J. 197, 210-11 (1997)).]

In this case, the Estate raises the second issue, arguing that the EDA's informal guidance violates the formal rulemaking procedures of the APA and exceeds the statutory authority provided to the EDA by the UST Act. Our review of this legal issue and the agency's interpretation of the UST statute is de novo. See id. at 658.

"Nonetheless, we 'defer to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is plainly unreasonable'" Ardan v. Bd. of Review, 231 N.J. 589, 604 (2018) (quoting In re Election Law Enf't Commn Advisory Op. No. 01–2008, 201 N.J. 254, 262 (2010)). "That deference derives from our 'understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise.'" Ibid. (quoting In re Election Law Enf't Commn, 201 N.J. at 262).

B.

The Estate contends that the informal guidance used by the EDA to evaluate applications by estates constitutes improper de facto rulemaking and is therefore invalid because the EDA did not engage in the formal procedures of the APA. The Estate argues that the guidance documents are inconsistent with the UST Act and its implementing regulations because: (1) the requirement that

an estate's liabilities exceed its assets is not contained in the Act or regulations; and (2) the proceeds from the Estate's sale of the Property were included as an asset when evaluating financial hardship. Therefore, the Estate seeks that the informal guidance be stricken in its entirety and that the denial of the Estate's application be reversed.

In response, the EDA contends that it did not engage in improper rulemaking and that it reasonably applied the UST Act and its implementing regulations to evaluate applications by estates. The EDA argues that it reasonably exercised its expertise to evaluate the financial hardship of estate applicants according to the estate's assets and liabilities, because estates are static entities comprised of an ascertainable amount of money determined by the assets and liabilities of the decedent. The EDA further contends that in enacting the UST, the Legislature did not intend that hardship grants function simply as handouts, but rather to assist struggling business owners and homeowners in their remediation efforts so that they are able to maintain their businesses or homes. The EDA argues that granting conditional hardship grants to all estates whose net worth does not exceed $500,000, without a separate finding of

financial hardship based on assets and liabilities, would be inconsistent with this legislative intent.[2]

The APA defines an administrative rule as "each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." N.J.S.A. 52:14B-2. "The term . . . does not include: (1) statements concerning the internal management or discipline of any agency; (2) intra-agency and inter-agency statements; and (3) agency decisions and findings in contested cases." Ibid.

"If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." In re N.J.A.C. 7:1B-1.1 Et Seq., 431 N.J. Super. 100, 134 (App. Div. 2013) (quoting Airwork Serv. Div., a Div. of Pac. Airmotive Corp. v. Dir., Div. of Taxation, 97 N.J. 290, 300 (1984)). These procedures require the agency to, among other things, publish notice of the proposed rule in the New Jersey Register, N.J.S.A. 52:14B-4(a)(1), "[a]fford all interested persons a reasonable opportunity to submit data, views, comments, or

---

[2] In this regard, the EDA contends that the Estate was still able to distribute nearly $76,000 to its beneficiaries after completing the remediation and would therefore receive a windfall of $70,524.07 if it received a grant.

arguments, orally or in writing," N.J.S.A. 52:14B-4(a)(3), and "[p]repare for public distribution . . . a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views, comments, and arguments contained in the submissions," N.J.S.A. 52:14B-4(a)(4).

"As an alternative to acting formally through rulemaking or adjudication, administrative agencies also may act informally." Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 136 (2001). "Although not easily defined, informal agency action is any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry." Id. at 136-37.

"An agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty, provided that it complies with due process requirements and the [APA]." Id. at 137. In this regard, "an exception has been created so that where the agency's action 'is inferable from the enabling statute itself and does not reflect a new or changed position, it will not be held invalid for failure to meet rule-making procedural requirements.'" St. Barnabas Med. Ctr. v. New Jersey Hosp. Rate Setting Comm'n, 250 N.J. Super. 132, 144 (App. Div. 1991) (quoting In re 1982 Final

Reconciliation Adjustment for Jersey Shore Medical Center, 209 N.J. Super. 79, 87 (App. Div. 1986)). Nonetheless, "[a]n agency may not use its power to interpret its own regulations as a means of amending those regulations or adopting new regulations." In re Hospitals' Petitions For Adjustment of Rates For Reimbursement of Inpatient Servs. to Medicaid Beneficiaries, 383 N.J. Super. 219, 247 (App. Div. 2006) (quoting Besler & Co. v. Bradley, 361 N.J. Super. 168, 173 (App. Div. 2003)).

The Supreme Court has enumerated six factors to consider in assessing whether an agency action constitutes rulemaking subject to the APA's procedures. See Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 331-32 (1984). These factors consider whether the agency action:

> (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative

regulatory policy in the nature of the interpretation of law or general policy.

[Ibid.]

"Not all factors need be present for an agency action to qualify as an administrative rule." In re Provision of Basic Generation Serv. for Period Beginning June 1 2008, 205 N.J. 339, 350 (2011). "The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule." Ibid.

To most clearly assess these factors in this case, we separately apply the factors to the two aspects of the informal guidance that the Estate challenges: (1) the assets and liabilities test for financial hardship; and (2) the informal guidance on the characterization of primary residences for estates.

Liabilities and Assets Test

In applying the Metromedia factors to the assets and liabilities test, we conclude that this informal guidance constitutes an administrative rule that was required to be promulgated pursuant to the APA's formal rulemaking procedures.

As to the first Metromedia factor, the record does not reveal whether applications by Estates are best considered "a large segment" or a "narrow select

group" of the applicants for conditional hardship grants under the UST Act. 97 N.J. at 331. The Estate argues that the informal guidance has wide coverage, but the EDA contends that estate applicants are a small segment of the general public. On balance, this factor may support adherence to the APA's rulemaking procedures, see In re Provision of Basic Generation Serv., 205 N.J. at 350-51, but we give little weight to this factor given the limited record.

The second factor, however, clearly supports that the assets and liabilities test constitutes an administrative rule. The standards expressed in the guidance documents are "intended to be applied generally and uniformly to all" applications for conditional hardship grants by estates. Metromedia, 97 N.J. at 331. Similarly, with respect to the third factor, the EDA provides the guidance documents to all prospective applicants and applies the guidance to evaluate all applications by estates. Thus, the third factor also is satisfied because the guidance is designed to operate prospectively.

The fourth factor is the most heavily contested by the parties. The EDA contends that giving appropriate deference to its interpretation of the UST Act, the assets and liabilities test is inferable from the Act and its implementing regulations. Specifically, the EDA suggests that the assets and liabilities test is inferable from the statutory language that "[a] finding of financial hardship . . .

shall be based upon a determination that an applicant cannot reasonably be expected to repay all or a portion of the eligible project costs if the financial assistance were to be awarded as a loan," N.J.S.A. 58:10A-37.5(c)(1), and from the regulatory language that "a finding of financial hardship by the Authority shall be based on a review of the applicant's financial condition," N.J.A.C. 19:31-11.6(b)(1)(i) (emphasis added).

We find, however, that the assets and liabilities test is far more specific than either of these sections and adds additional criteria (assets and liabilities) that are not otherwise mentioned in the UST Act or its implementing regulations. Under the terms of the Act, for an application not pertaining to a business property, an award of a financial hardship grant is based on (1) "a determination that an applicant cannot reasonably be expected to repay all or a portion of the eligible project costs if the financial assistance were to be awarded as a loan" and (2) "the applicant's taxable income in the year prior to the date of the application being submitted." N.J.S.A. 58:10A-37.5(c)(1). In this regard, the record does not reflect that the EDA considers any additional criteria other than the taxable income from the previous year in determining whether an individual applicant can reasonably be expected to repay the loan and has a financial

hardship.[3] Likewise, although N.J.A.C. 19:31-11.6 provides that "a finding of financial hardship . . . shall be based on a review of the applicant's financial condition," the parameters of the assets and liabilities test are not clearly and obviously inferable from this regulatory subsection.[4]

In this case, the Estate notes that its taxable income in the year prior to its application was $0.00 and its net worth was below the $500,000 statutory limit. Accordingly, had the EDA "based its finding upon the applicant's taxable income in the year prior to the date of the application being submitted," N.J.S.A. 58:10A-37.59(c)(1), the EDA would have determined that the Estate could not reasonably have been expected to repay a loan and had a financial hardship. Thus, as demonstrated by the Estate's application, the informal guidance provides determinative standards for evaluating applications by estates.

---

[3] The Personal Finance Sheet does ask all applicants to provide information regarding their personal annual expenditures, asset totals, liability totals, and properties and businesses owned. However, there is no indication in the record that this information is used to calculate anything other than net worth and income for non-estate individual applicants.

[4] Moreover, the FAQ Sheet provides that an estate's assets include primary residences and pensions, whereas the UST Act clearly provides that primary residences and pensions are excluded from the calculation of net worth. N.J.S.A. 58:10A-37.5(c)(1).

Although we agree with the EDA that the UST Act was not intended to provide conditional hardship grants as handouts to applicants who could otherwise reasonably be expected to repay a loan, the EDA may not establish determinative standards for financial hardship that are not contained in or clearly inferable from the Act or its regulations without engaging in the APA's formal rulemaking procedures. In these ways, despite the deference given to an agency's interpretation of its enabling statute and implementing regulation, the fourth Metromedia factor is established because the assets and liabilities test is not clearly and obviously inferable from the UST Act or its implementing regulations. See In re N.J.A.C. 7:1B-1.1 Et Seq., 431 N.J. Super. 100, 138 (App. Div. 2013) (holding that factors four and five were met where the DEP's informal guidance on waiver regulations "elaborate[ed] upon and clarif[ied] the very standards by which applicants will be held and the outcomes of their applications").

Similarly, the fifth factor is satisfied because the assets and liabilities test was not previously expressed in any official and explicit agency rule, as neither the UST Act nor its implementing regulation refer to such a test for evaluating financial hardship. See Ardan, 231 N.J. at 606-07 (holding that agency's

interpretation of its regulation was plainly unreasonable where fourth and fifth factors were satisfied.).

As to the sixth factor, the unofficial guidance documents distinctly reflect "a decision on administrative regulatory policy in the nature of the interpretation of law or general policy," Metromedia, 97 N.J. at 331, specifically the application of the UST Act and its implementing regulations to applications by estates. See In re Adoption of Reg'l Affordable Hous. Dev. Program Guidelines, 418 N.J. Super. 387, 393 (App. Div. 2011). Thus, the sixth factor supports that the assets and liabilities test constitutes an administrative rule.

In sum, we find that five of the six Metromedia factors support that the assets and liabilities test contained in the informal guidance constitutes an administrative rule. Although the EDA's interpretation of the UST Act and its implementing regulations warrants deference, the requirement that an estate's liabilities exceeds it assets to qualify for a conditional hardship grant is not "clearly and obviously inferable" from the Act or its implementing regulations. Metromedia, 97 N.J. at 331. For these reasons, we conclude that that the assets and liabilities test is invalid because it was not promulgated pursuant to the APA's formal rulemaking procedures.

Primary Residence Characterization

In applying the Metromedia factors to the informal guidance on the characterization of primary residences for estates, we conclude that the informal guidance does not constitute an improper de facto rule.

As to the first, second, third, and sixth factors, we find the above analysis with respect to the assets and liabilities test is similarly applicable to the informal guidance's characterization of primary residences for estates. Thus, we give little weight to the first factor, and we find that the second, third, and sixth factors support that the informal guidance is an administrative rule.

As to the fourth factor and fifth factors, however, we find that the EDA's characterization of primary residence for estates is clearly inferable from the UST Act and does not materially change any eligibility requirements for estate applicants. With respect to these factors, the EDA argues that its criteria for characterizing the primary residences for estates are a "commonsensical" interpretation of the UST Act. The EDA contends that the Estate Sheet reasonably characterizes the project site based on its use at the time of the decedent's death or within twelve months of the decedent's death. The Estate counters that the EDA strayed from the UST Act's mandates on primary

residences by counting the proceeds from the sale of the Property in its calculation of the Estate's net worth and assets.

We agree with the EDA that it is clearly inferable from the Act that an estate's primary residence would be characterized based on its use at the time of the decedent's death. Likewise, it is easily inferable from the Act that once an estate sells a primary residence, the proceeds from the sale will be considered a monetary asset and will be included in the calculation of net worth. Any other interpretations would fail to give effect to the plain terms of N.J.S.A. 58:10A-37.5(c)(1) that net worth is to be calculated only "exclusive of the applicant's primary residence and pension." See Ardan, 231 N.J. at 604-05 ("To apply the 'plainly unreasonable' standard, we first consider the words of the statute, affording to those words 'their ordinary and commonsense meaning.'" (quoting In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 542 (2016))).

Thus, we conclude that the fourth factor is not satisfied because the EDA's interpretation is "clearly and obviously inferable" from the Act. Metromedia, 97 N.J. at 331. Similarly, the fifth factor is not satisfied because EDA's informal guidance is consistent with the UST Act and does not constitute a "material and significant change" from the policy expressed on primary residences in the UST Act and its implementing regulations. Ibid.

In sum, although some of the Metromedia factors support that the informal guidance in the Estate Sheet concerning primary residences is a de facto rule, we conclude that fourth and fifth Metromedia factors weigh more heavily in the agency's favor. These factors support that the informal guidance on primary residences is not an administrative rule because the EDA's interpretation is clearly inferable from the UST ACT. See St. Barnabas, 250 N.J. Super. at 144. According due deference to this interpretation, the EDA's criteria for the characterization of the primary residences for estates are not plainly unreasonable. See Ardan, 231 N.J. at 604-05. We therefore conclude that the EDA's informal guidance on the characterization of primary residences for estates is valid and does not constitute an improper de facto rule.

C.

For the above reasons, we conclude that the assets and liabilities test contained in the EDA's informal guidance documents is an improper de facto rule and must be invalidated because the EDA did not follow the formal rulemaking procedures of the APA. However, we conclude that the EDA's informal guidance on primary residences of estates is not an administrative rule and that the EDA may continue to apply the informal guidance's criteria regarding the primary residences of estates.

In this case, when applying only the primary residences criteria and not the assets and liabilities test, the Estate's application for a conditional hardship grant should be approved. Even when factoring in the proceeds from the sale, the Estate would not exceed the taxable income limit of $250,000 (because the requirement is based on the income from the previous tax year) or the $500,000 net worth limit. Additionally, as discussed above, had the EDA based its evaluation of financial hardship on the Estate's taxable income from the previous year, it would have determined that the Estate could not reasonably be expected to pay back a loan and that the Estate had a financial hardship.

Accordingly, we reverse the EDA's denial of the Estate's application because the Estate would have met all requirements for a conditional hardship grant if the EDA had not applied the assets and liabilities test. If the EDA seeks to apply the assets and liabilities test to evaluate future applications, we direct the agency to post notice of its proposed rule in the New Jersey Register, in accordance with N.J.S.A. 52:14B-4, within ninety days.[5]

---

[5] Although we are constrained to reverse the EDA's denial of a conditional hardship grant on the particular facts of this case, we do not address the issue of how our decision would impact any potential future grant applications by estates.

To the extent we have not addressed any other arguments raised by the parties, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION